UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------x
In re                                                Chapter 11

ICON REALTY CORP.                                    Case no. 09-14485

                        Debtor.
----------------------------------------------------------x

## AMENDED DISCLOSURE STATEMENT

**THIS PROPOSED DISCLOSURE STATEMENT IS BEING SUBMITTED TO ALL CREDITORS AND PARTIES IN INTEREST OF ICON REALTY CORP. ("DEBTOR"). IT IS SUBJECT TO FINAL APPROVAL AT THE CONFIRMATION AND DISCLOSURE STATEMENT HEARING DESCRIBED BELOW. IF THERE IS AN OBJECTION TO APPROVAL OF THE DISCLOSURE STATEMENT, IT WILL BE CONSIDERED AT THE CONFIRMATION HEARING.**

**THIS DISCLOSURE STATEMENT CONTAINS INFORMATION THAT MAY AFFECT CREDITORS' DECISIONS TO ACCEPT OR REJECT THE DEBTOR'S PLAN OF REORGANIZATION. ALL CREDITORS ARE URGED TO READ THIS DISCLOSURE STATEMENT CAREFULLY. ALL CAPITALIZED TERMS CONTAINED IN THIS DISCLOSURE STATEMENT SHALL HAVE THE SAME MEANING AS CAPITALIZED TERMS CONTAINED IN THE PLAN OF REORGANIZATION ANNEXED TO THE DISCLOSURE STATEMENT AS EXHIBIT A.**

**EXCEPT FOR THE SECURED LENDER WHO HAS AGREED TO THE PLAN, THE PLAN PROVIDES FOR PAYMENT IN FULL IN CASH TO ALL CREDITORS. ACCORDINGLY, ALL CREDITORS ARE UNIMPAIRED AND ARE DEEMED TO HAVE ACCEPTED THE PLAN.**

**THE DISCLOSURE STATEMENT HAS NOT BEEN APPROVED BY THE BANKRUPTCY COURT. COURT APPROVAL OF THE DISCLOSURE STATEMENT DOES NOT CONSTITUTE COURT APPROVAL OF THE TERMS OF THE PLAN.**

Mark A. Frankel
BACKENROTH FRANKEL & KRINSKY, LLP
489 Fifth Avenue
New York, New York 10017
Telephone: (212) 593-1100
Fascimile: (212) 644-0544
ATTORNEYS FOR THE DEBTOR

## INTRODUCTION

1.      The Debtor submits this preliminary Disclosure Statement ("Disclosure Statement") in connection with the solicitation of acceptances of its Plan of Reorganization ("Plan") under Chapter 11 of the United States Bankruptcy Code.  A copy of the Plan is attached hereto as <u>Exhibit "A"</u>.  All Creditors are urged to review the Plan, in addition to reviewing this Disclosure Statement.  <u>All capitalized terms used but not defined herein shall have the meaning set forth in the Plan.</u>  Any objections to final approval of this disclosure statement must be made at the same time and manner as objections to confirmation of the Plan (see pages 17 to 18 below).

2.      This Disclosure Statement is not intended to replace a review and analysis of the Plan.  Rather, it is submitted as a review of the Plan in an effort to explain the terms and implications of the Plan.  Every effort has been made to fully explain the various aspects of the Plan as it affects all Creditors.  To the extent a Creditor has any questions, the Debtor urges you to contact its counsel and every effort will be made to assist you.

**THE DEBTOR WILL NOT BE SOLICITING VOTES BECAUSE ALL CREDITORS ARE DEEMED TO HAVE ACCEPTED THE PLAN.**

3.      Creditors should read this Disclosure Statement in its entirety.

4.      EXCEPT AS SET FORTH IN THIS DISCLOSURE STATEMENT, NO REPRESENTATIONS CONCERNING THE DEBTOR, ITS ASSETS, ITS PAST OR FUTURE

OPERATIONS, OR THE PLAN ARE AUTHORIZED, NOR ARE ANY SUCH

REPRESENTATIONS TO BE RELIED UPON IN ARRIVING AT A DECISION WITH

RESPECT TO THE PLAN.  ANY REPRESENTATIONS MADE TO SECURE ACCEPTANCE

OR REJECTION OF THE PLAN OTHER THAN AS CONTAINED IN THIS DISCLOSURE

STATEMENT SHOULD BE REPORTED TO COUNSEL FOR THE DEBTOR.


5.      THE INFORMATION CONTAINED IN THIS DISCLOSURE

STATEMENT HAS BEEN SUPPLIED BY THE DEBTOR.  THE DEBTOR'S BOOKS AND

RECORDS HAVE BEEN USED TO PROVIDE THE INFORMATION CONCERNING THE

DEBTOR'S FINANCIAL CONDITION AS SET FORTH IN THIS DISCLOSURE

STATEMENT.  THE INFORMATION HAS NOT BEEN SUBJECT TO AUDIT.


## GENERAL INFORMATION REGARDING THE DEBTOR


6.      The Debtor filed its Chapter 11 Petition on July 15, 2009.


7.      The Debtor owns that certain real property located at 170-174 Nagle

Avenue, New York, New York (the "Property").  The Property is a five story residential

apartment building with sixty apartments and 10 commercial units.


8.      There are no actions presently pending against the Debtor except a

foreclosure action wherein summary judgment has been granted to Intervest Bank.

9.      The Debtor's only significant asset is the Property.  The Debtor's goal upon filing was to either re-finance the Property or to sell the Property to pay the Debtor's creditors to the greatest extent possible.

10.      The Debtor was unable to refinance.  Under the Plan, the Property will be sold pursuant to the terms and conditions of the Sale Contract, a copy of which is annexed as Exhibit A to the Plan.  As part of the Sale Contract, Intervest agreed to adjust the default interest rate to enable payment in full in cash plus interest to all creditors as well as a distribution to the Debtor's Equity Holder.

11.      The Debtor and Intervest participated in extensive marketing both pre-petition and post-petition, and, ultimately, the Purchaser under the Sale Contract agreed to pay $10.2 million.  Given the marketing effort, the Debtor believes that $10.2 million is the value of the Property.

12.      As of January 2010, the face amount of the Debtor's liability to Intervest totals in excess of $10.6 million as calculated by carrying forward the accounting used by the referee in the foreclosure action, however, even that calculation does not include various other fees and expenses also due by the Debtor.  In addition, the Debtor owes $30,000 plus accrued interest on account of a second mortgage in favor of Andrew Glass Brokerage, and unsecured

claims totaling approximately $108,285. The Debtor also owes approximately $24,000 on an automobile loan secured by a 2007 Mustang.

13.     In summary, the Plan is predicated upon a private sale of the Debtor's Property to a group of individuals or their designees pursuant to the Sale Contract for a total purchase price of $10.2 million under 11 U.S.C. §363(b) and (f) and 11 U.S.C.§1123(a)(5) such that approval and confirmation of the Plan shall be deemed approval of the sale of the Property for all purposes. Based upon certain voluntary accommodations made by the Bank as the holder of a first mortgage, the Bank shall receive an assignment of mortgage plus the sum of $1,909,167 from the cash paid at closing of $2,500,000. The balance of this cash of $590,833 (hereinafter, the "Excess Cash") will be sufficient to pay all other claims in full and leave a surplus available for the Debtor's equity holders of approximately $212,045. Consistent with the ruling of the United States Supreme Court, confirmation of the Plan will precede the actual transfer of the Property so that the exemption under 11 U.S.C. §1146(a) shall properly apply.

14.     In the absence of Intervest's agreement, it is extremely unlikely that there would be a material distribution to creditors or the Equity Holder, let alone payment in full in cash with interest to all creditors herein plus a substantial distribution to equity, as set forth herein and in the Sale Contract.

**DEBTOR'S PLAN OF REORGANIZATION**
**CLASSIFICATION AND TREATMENT OF CLAIMS**

### Class 1: Secured Tax Claim

15.     **Classification** – Class 1 consists of the Secured Claims of the City of New York for unpaid real estate tax, including recorded liens for real estate tax, water and sewer charges and related liens on the Debtor's Property.  To the best of the Debtor's knowledge, there are no Class 1 claims.

16.     **Treatment** -- Class 1 Claims shall be paid in full plus interest at the applicable statutory rate on the Payment Date from the Excess Proceeds.

17.     **Voting** -- The Holder of the Class 1 Claim is unimpaired and is deemed to have accepted the Plan.

### Class 2: Intervest Mortgage Claim

18.     **Classification** –  Class 2 consists of the first mortgage on the Property held by Intervest National Bank.  As part of the Plan, Intervest's claim is being fixed in the amount of principal, interest at the contract rate plus 1% through the Effective Date, plus additional fees and expenses as set forth on Schedule H to the Sale Contract, which amount the Debtor estimates will total $9,609,167 as of the Effective Date.

19. **Treatment** – Intervest shall be entitled to all of the rights, benefits and amounts due, as set forth more particularly in the Sale Contract. To this end, Intervest shall receive an assignment of the existing mortgage as modified to the extent of $7,700,000, plus payment of $1,909,167 from the sale proceeds at closing on the Payment Date.

20. **Voting** – The Holder of the Class 2 Claim is impaired, but has agreed to accept the Plan so long as the Bank receives the assignment of existing mortgage and sum of $1,909,167 on the Payment Date from the cash sale proceeds of $2,500,000 to be independently funded at closing by the New Purchaser. The holder of the Class 2 Claim is entitled to vote and has agreed to accept the plan.

### Class 3: Glass Mortgage

21. **Classification** – Class 3 consists of the Claim of Andrew Glass Brokerage, which holds a junior mortgage on the Property in the principal amount of $30,000 plus interest.

22. **Treatment** – Class 3 shall be paid the principal amount due, plus interest thereon as provided for in the subject note and mortgage in the estimated sum of $35,000 from Excess Cash.

23.     **Voting** –   The Holder of the Class 3 Claim is unimpaired and is deemed to have accepted the Plan.


**Class 4: Ford Motor Credit**


24.     **Classification** –   Class 4 consists of the Claim of Ford Motor Credit, which holds a automobile loan in an outstanding amount of approximately $23,708 as of October 1, 2009, secured by a 2007 Ford Mustang owned by the Debtor.  As of December 16, 2009, the reinstatement amount for the Class 4 claim is $6,021 plus a $75.00 reinstatement fee for a total of $6,096.


25.     **Treatment** – Class 4 shall be paid the total amount due to reinstate the Class 4 financing agreement, and the Debtor shall continue to pay the amounts due under the financing agreement with funds to be contributed by the Debtor's equity holder.


26.     **Voting** –   The Holder of the Class 4 Claim is unimpaired and is deemed to have accepted the Plan.

**Class 5: Priority Claims**

27.   **Classification** –  Class 5 consists of Allowed Priority Claims under Sections 507(a)(2),(3),(4),(5),(6),(7),and (8) of the Bankruptcy Code.  The City of New York filed an $1,100 corporation tax claim and the Internal Revenue Service filed an estimated claim in the amount of $5,428.

28.   **Treatment** – Holders of Allowed Class 5 Claims shall be paid in full in Cash plus interest at the applicable statutory rate on the Effective Date.

29.   **Voting** –  Class 5 is unimpaired and is deemed to have accepted the Plan.

**Class 6: Unsecured Claims**

30.   **Classification** –  Class 6 consists of Allowed Unsecured Claims.  Based upon the Debtor's schedules and the Clerk of Court's claims docket, Class 6 includes 5 Claims total $102,264.

31.   **Treatment** –  Class 6 Claimants shall be paid in full plus interest at the Legal Rate from the Petition Date.

32. **Voting** – Class 6 Claims is unimpaired and is deemed to have accepted the Plan.

## Class 6: Equity Holders

33. **Classification** – Class 7 consists of Vasillos Roufanis, the Debtor's president and sole shareholder.

34. **Treatment** – The Class 7 Equity Holder shall be entitled to such surplus as may be available on the Payment Date after payment of Administration Claims, Class 1, Class 2, Class 3, Class 4, Class 5 and Class 6 Claims under the Plan, plus such other amounts that may be due by the Debtor under the Sale Contract. The Debtor estimates that Class 7 shall be entitled to approximately $212,000 plus such amounts as may be available after the Receiver completes his final accounting.

35. **Voting** – The Holder of Class 7 Equity Interests is impaired and is entitled to vote to accept or reject the Plan.

## ADMINISTRATIVE EXPENSES

36. Allowed Administrative Expenses (including Receiver Fees, Receiver Counsel Fees and the Debtor's Professional Fees) anticipated to total $110,000 shall be paid in

full from Excess Cash on the Payment Date, or the date such Administrative Expense becomes Allowed, except to the extent that the holder of an Allowed Administrative Expense agrees to a different treatment; provided, however, that Allowed Administrative Expenses representing obligations incurred in the ordinary course of business shall be paid in full or performed by the Receiver in the ordinary course of business or pursuant to the terms and conditions of the particular transaction.  Any fees or charges assessed against the Debtor's Estate under Chapter 123, Title 28, United States Code shall be paid in full as they come due or from either the funds collected by the Receiver or the sale proceeds.  In addition, at closing the security deposits of the Debtor's tenants shall be replenished as set forth in Exhibit A to the Plan, totaling $120,000.

37.     Backenroth Frankel & Krinksy, LLP, as counsel for the Debtor, received a $20,000 retainer before the filing of the Debtor's petition.  Debtor's counsel estimates that it will have incurred additional outstanding fees of approximately $25,000 upon confirmation of the Plan.

## MEANS FOR IMPLEMENTATION OF THE PLAN

38.     **Sale**.  The Property shall be sold and transferred to the New Purchaser pursuant to the Sale Contract.  The Debtor shall take all necessary steps, and perform all necessary acts, to consummate the terms and conditions of the Plan, including, without limitation, effectuating a closing on the Sale Contract based upon approval of this Plan and entry of the Confirmation Order.  In furtherance of the Plan and as the means of funding the

obligations due hereunder, the Property will be sold to the Purchaser or its nominee pursuant to the Sale Contract, a copy of which is annexed to the Plan as Exhibit A. The sale shall be free and clear of any liens claims and encumbrances, with such liens, claims and encumbrances, if any, to attach to the cash proceeds of sale. The sale shall close on or before the Effective Date, subject to such extensions as may be necessary to consummate the sale. The Debtor hereby authorizes the Bank to cause to be paid or escrowed on the Debtor's behalf, all distributions required hereunder to creditors from the Excess Cash at the time of closing. The Sale Contract provides for $2,500,000 of cash proceeds plus the assignment and assumption of the Debtor's mortgage in the amount of $7,700,000. The Debtor's projected Effective Date disbursement of the $2,500,000 of cash proceeds is set forth on Exhibit B hereto.

39.     **Receiver**.  On the Effective Date, the receivership shall be deemed concluded and terminated, whereupon the Receiver shall be deemed discharged. As such, any and all interests and rights in and to all property, held by or entitled to be received by the Receiver, shall be transferred to the Debtor after payment of all outstanding debts and obligations incurred by the Receiver prior to closing in the ordinary course of business. On the Effective Date, the Receiver shall provide the Debtor with a final accounting as to all sums collected by the Receiver during the receivership and the application thereof. Notwithstanding the foregoing, the Receiver shall be entitled to hold back from turnover to the Debtor, the claimed amount of receivership fees and expenses, including legal fees, pending approval of such fees by the Bankruptcy Court.

40. **Revesting of Assets.** Except as otherwise provided herein concerning the Sale of Property and distribution of the cash proceeds pursuant to the terms hereof, any other residual assets, if any, (including potential surplus in the Receiver's Account), shall vest in the Debtor free and clear of all Liens, Claims and encumbrances if and when all required distributions made hereunder are paid in full. Any and all Liens, Claims and encumbrances that have not been expressly preserved under the Plan shall be deemed extinguished as of such date. Except as otherwise provided herein, as of the Effective Date, all property of the Debtor shall be free and clear of all Claims and Interests of Creditors, except for the obligations that are imposed under the Plan or by a Final Order of the Bankruptcy Court.

41. **Execution of Documents**. The Debtor shall be authorized to execute, in the name of any necessary party, any notice of satisfaction, release or discharge of any Lien, Claim or encumbrance not expressly preserved in the Plan and deliver such notices to any and all federal, state and local governmental agencies or departments for filing and recordation.

42. **Filing of Documents.** Each and every federal, state and local governmental agency or department shall be authorized to accept and record any and all documents and instruments necessary, useful or appropriate to effectuate, implement and consummate the transaction contemplated by the Plan, including, but not limited to any and all notices of satisfaction, release or discharge of any Lien, Claim or encumbrance not expressly preserved by the Plan, and the Confirmation Order.

43. **11 U.S.C. 1146**. Under the Plan, pursuant to Bankruptcy Code § 1146(a) the issuance, transfer or exchange of any securities, instruments or documents, (b) the creation of any other Lien, mortgage, deed of trust or other security interest, (c) the making or assignment of any lease or sublease or the making or delivery of any deed or other instrument of transfer under, pursuant to, in furtherance of, or in connection with, the Plan, including, without limitation, any deeds, bills of sale or assignments executed in connection with the purchase of the Property by the Purchaser and any other transaction contemplated under the Plan or the re-vesting, transfer or sale of any real or personal property of the Debtor pursuant to, in implementation of, or as contemplated in the Plan, and (d) the issuance, renewal, modification or securing of indebtedness by such means, and the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan. Consistent with the foregoing, and the Supreme Court interpretation of the Bankruptcy Code § 1146(a) exemption, each recorder of deeds or similar official for any county, city or governmental unit in which any instrument hereunder is to be recorded, any instrument of transfer of the title to the Property, pursuant to the Confirmation Order, shall accept such instrument, without requiring the payment of any filing fees, documentary stamp tax, deed stamps, stamp tax, transfer tax, mortgage tax, intangible tax or similar tax, including without limitation New York City Real Property Transfer Tax and New York State Documentary Tax. The Confirmation Order shall expressly reference and incorporate this provision of the Plan so it is absolutely clear that the Debtor properly qualifies for the Section 1146(a) exemption.

## EXECUTORY CONTRACTS

44.     All tenant leases shall be deemed assumed and assigned to the purchaser under the Sale Contract.  All other executory contracts not assumed before the Effective Date, including, shall be deemed rejected on the Effective Date.

## LITIGATION ANALYSIS

45.     No litigation is pending or contemplated herein.

## OBJECTIONS TO CLAIMS

46.     Except for the IRS claim, the Debtor does not anticipate any objections to claims, but in an abundance of caution, the Debtor reserves the right to object or contest the allowance of any Claims, except the claims of the Bank, provided an objection is filed prior to Confirmation and reserves are established in the event the objection is still pending on the Effective Date.

## MANAGEMENT OF THE DEBTOR

47.    The Debtor is managed by Vasilios Roufanis, the Debtor's president.  The Property is managed by the Receiver.  Post-confirmation management of the Property will be determined by the Purchaser of the Property.

## TAX CONSEQUENCES

48.    The Debtor does not believe that there will be any negative tax consequences to the Debtor or to Creditors under the Plan.  To the extent a Creditor may have taken bad debt deduction for amounts owed by the Debtor, Plan distributions may constitute taxable income.

49.    **THE DEBTOR DOES NOT PURPORT, THROUGH THIS DISCLOSURE STATEMENT, TO ADVISE THE CREDITORS OR INTEREST HOLDERS REGARDING THE TAX CONSEQUENCES OF THE TREATMENT OF THE CREDITORS AND INTEREST HOLDERS UNDER THE PLAN.  CREDITORS AND INTEREST HOLDERS SHOULD SEEK INDEPENDENT COUNSEL CONCERNING THE TAX CONSEQUENCES OF THEIR TREATMENT UNDER THE PLAN.**

50.     The Debtor may transfer the Property without the imposition of New York City Real Property Transfer Tax and New York State Documentary Tax, and pursuant to Section 1146(a) of the Bankruptcy Code. All City of New York filing officers are authorized to record the documents evidencing said transfer immediately upon presentation thereof without the payment of such amounts.

## FINANCIAL ANALYSIS AND LIQUIDATION ANALYSIS

51.     Creditors will be paid in full in cash with interest under the Plan, except that Intervest has agreed to be impaired as set forth in Exhibit A to the Plan.

52.     The Debtor believes that the $10.2 million purchase price provided for in the Sale Contract is the value of the Property because the contract was the result of many months of intensive marketing.  A Chapter 7 liquidation sale of the Property would be unlikely to generate sufficient proceeds to pay all creditors in full with interest.  Indeed, in a Chapter 7 sale context, the claims would be dramatically larger than in a Chapter 11 plan context because the Debtor's estate would not enjoy the benefit of the Debtor's agreement by Intervest to reduce its claim, and in addition, in a Chapter 7 sale context, the estate would be burdened by additional Chapter 7 administration costs including trustee compensation, trustee's attorney's compensation, trustee's accountant compensation, broker's commissions, and transfer tax obligations.  Accordingly, the Debtor believes that the only means by which all creditors are assured payment in full in cash with interest, is by confirmation of the Debtor's Plan.

53.     A balance sheet and liquidation analysis are annexed hereto as Exhibit B.


## VOTING PROCEDURES AND REQUIREMENTS


54.     The Plan leaves all creditors, other than the Bank, unimpaired; however, the Bank has agreed to accept the Plan subject to the terms and conditions set forth on Exhibit A to the Plan.  Therefore, since all creditors have either accepted the Plan or are deemed to have accepted the Plan, votes will not be solicited from creditors.


## CONFIRMATION OF THE PLAN


55.     Section 1128(a) of the Bankruptcy Code requires that the Bankruptcy Court, after notice, hold a hearing on confirmation of the Plan (the "Confirmation Hearing"). Section 1128(b) provides that any party in interest may object to confirmation of the Plan.


56.     By order of the Bankruptcy Court dated December 29, 2009, the Confirmation Hearing and hearing on final approval fo the Disclosure Statement has been scheduled for January 20, 2010, at 10:00 a.m., in Judge Gropper's Courtroom, United States Bankruptcy Court, One Bowling Green, New York, New York.  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for an announcement made at the Confirmation Hearing or any adjourned Confirmation Hearing.  Any

objection to confirmation of the Plan must be made in writing and filed with the Bankruptcy Court with proof of service and served upon the following on or before January 19, 2009:

> Backenroth Frankel & Krinsky, LLP
> 489 Fifth Avenue
> New York, New York  10017
> Mark A. Frankel, Esq.

Objections to confirmation of the Plan are governed by Bankruptcy Rule 9014.

57.     At the Confirmation Hearing, the Bankruptcy Court will determine whether the requirements of Section 1129 of the Bankruptcy Code have been satisfied to enter an order confirming the Plan.  The applicable requirements are as follows:

a.     The Plan complies with the applicable provisions of the Bankruptcy Code;

b.     The Debtor has complied with the applicable provisions of the Bankruptcy Code;

c.     The Plan has been proposed in good faith and not by any means forbidden by law;

d.     Any payment made or promised by the Debtor or by a person issuing securities or acquiring Subject Premises under the Plan, for services or for costs and expenses in, or in connection with, the Bankruptcy Case, or in connection with the Plan and incident to the Bankruptcy Case, has been disclosed to the Bankruptcy Court, and any such payment made before the confirmation of the Plan is reasonable, or if such payment is to be fixed after confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable;

e.     The Debtor has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director, officer, or voting trustee of the Debtor, an affiliate of the Debtor participating in a Plan with the Debtor, or a successor to the Debtor under the Plan, and the appointment to, or continuance in, such office of such individual, is consistent with the interests of Creditors and equity security holders and with public policy, and the Debtor has disclosed the identity of any insider that will be employed or retained by the reorganized Debtor, and the nature of any compensation for such insider;

f.     With respect to each class of impaired Claims, either each holder of a Claim or interest of such class has accepted the Plan, or will receive or retain under the Plan

on account of such Claim or interest Subject Premises of a value, as of the Effective Date of the Plan, an amount that is not less than the amount that such holder would so receive or retain if the Debtor was liquidated on such date under Chapter 7 of the Bankruptcy Code;

g.      Each class of Claims or interests has either accepted the Plan or is not impaired under the Plan;

h.      Except to the extent that the holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that Administrative Expenses and priority Claims will be paid in full on the Effective Date;

i.      If any class of Claims is impaired, at least one class of impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim of such class; and

j.      Confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization of the Debtor or any successors to the Debtor under the Plan unless such liquidation or reorganization is proposed in the Plan.

58.      The Debtor believes that the Plan satisfies all of the statutory requirements of Chapter 11 of the Bankruptcy Code, that the Debtor has complied or will have complied with all of the requirements of Chapter 11, and that the proposals contained in the Plan are made in good faith.

## **CRAMDOWN**

59.      All impaired creditors have agreed to accept the Plan, and therefore the cramdown provisions of the Code do not apply to this case.

The Debtor submits that the Plan is in the best interests of creditors.

Dated: New York, New York
         December 29, 2009

                                    **ICON REALTY CORP.**

                                    By: <u>s/Vasilios Roufanis, President</u>

                                    **BACKENROTH FRANKEL & KRINSKY, LLP**
                                    **Attorneys for Debtor**

                                    By:     <u>s/Mark A. Frankel </u>
                                            489 Fifth Avenue
                                            New York, New York 10017
                                            (212) 593-1100

Exhibit A

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x
In re                                                                    Chapter 11

ICON REALTY CORP.                                          Case no. 09-14485

                          Debtor.
-----------------------------------------------------------x


## DEBTOR'S AMENDED PLAN OF REORGANIZATION


**BACKENROTH, FRANKEL & KRINSKY, LLP**
489 5th Avenue
New York, NY 10017
(212) 593-1100
Attorneys for the Debtor

## INTRODUCTION

Icon Realty Corp. ("Debtor"), proposes this Plan of Reorganization for the

Debtor. **UPON CONFIRMATION, THIS PLAN SHALL BE A BINDING OBLIGATION BETWEEN AND AMONG THE DEBTOR, EACH OF THE DEBTOR'S CREDITORS, AND THE INTEREST HOLDERS (AS ALL SUCH TERMS ARE DEFINED BELOW)**.

## ARTICLE

## 1

## DEFINITIONS

As used in this Plan, the following terms will have the meanings hereinafter set forth:

1.1     **"Administrative Expense"** Any cost or expense of administration of the Bankruptcy Case entitled to priority under section 507(a)(1) and allowed under section 503(b) of the Bankruptcy Code, and any fees or charges assessed against the Debtor's Estate under Chapter 123, Title 28, United States Code.

1.2     **"Administrative Expense Claim"**  A claim for payment of an Administrative Expense.

1.3     **"Allowance Date"** shall mean the date which a Disputed Claim becomes an Allowed Claim by Final Order.

1.4     **"Allowed Amount"** shall mean the allowed amount of a Claim against the Debtor: (a) to the extent that a Proof of Claim is filed timely or, with leave of the Court late filed as to which (i) no party in interest files an objection or (ii) which is allowed by a Final Order; or (b) which is listed on the Debtor's schedules or any amendments thereto but which is not listed therein as disputed, unliquidated or contingent.

1.5    **<u>"Allowed Secured Claim"</u>** shall mean an Allowed Claim for which a Claimant asserts and is determined by a Final Order to hold a valid, perfected and enforceable Lien, security interest or other interest or encumbrance in property in which the Debtor has an interest not subject to avoidance or subordination under the Bankruptcy Code or applicable non-bankruptcy law, or an Allowed Claim for which a Claimant asserts a setoff under Section 553 of the Bankruptcy Code and such Claim is allowed by Final Order, but in any event only to the extent of the value, determined in accordance with section 506(a) of the Bankruptcy Code, of the Claimant's interest in the Debtor's interest in the property or to the extent of the amount subject to such setoff, as the case may be.

1.6    **<u>"Allowed Unsecured Claim"</u>** shall mean an Unsecured Claim to the extent same is allowed.

1.7    **<u>"Bank"</u>** shall mean Intervest National Bank.

1.8    **<u>"Bankruptcy Case"</u>** shall mean this Chapter 11 bankruptcy case of the Debtor.

1.9    **<u>"Bankruptcy Code"</u>** shall mean Title 11 of the United States Code (11. U.S.C. § 101 <u>et</u>. <u>seq</u>.), as in effect on the Petition Date and as amended during the Bankruptcy Case.

1.10    **<u>"Bankruptcy Court"</u>** shall mean the Court as defined below.

1.11    **<u>"Cash"</u>** shall mean all cash and cash equivalents which evidence immediately available funds in United States dollars.

1.12    **<u>"Claim"</u>** shall mean a right to payment as set forth in § 101(5) of the Bankruptcy Code.

1.13    **<u>"Claimant"</u>** shall mean the holder of a Claim.

1.14    **<u>"Confirmation Date"</u>** shall mean the date of the entry of the Confirmation Order.

1.15    **<u>"Confirmation Hearing"</u>** shall mean the hearing pursuant to the Bankruptcy Code Section 1128 before the Bankruptcy Court regarding the proposed confirmation of the Plan.

1.16    **<u>"Confirmation Order"</u>** shall mean the order of the Court confirming the Plan.

1.17    **<u>"Court"</u>** shall mean the United States Bankruptcy Court for the Southern District of New York.

1.18    **<u>"Creditor"</u>** shall mean any entity that holds a claim against the Debtor.

1.19    **<u>"Debtor"</u>** shall mean Icon Realty Corp.

1.20    **<u>"Disputed Claim"</u>** shall mean the whole or any portion of any claim against the Debtor to which an objection is timely filed as to which a Final Order has not been entered allowing or disallowing such Claim or any portion thereof.

1.21    **<u>"Effective Date"</u>** shall mean the Date upon which the Confirmation Order becomes a Final Order, or such earlier or later date as may be practicable.

1.22    **<u>"Estate"</u>** shall mean the estate of the Debtor created upon the commencement of the Bankruptcy Case pursuant to Section 541 of the Bankruptcy Code.

1.23    **<u>"Executory Contracts"</u>** shall mean "executory contracts" and "unexpired leases" as such terms are used within Section 365 of the Bankruptcy Code.

1.24    **<u>Final Order</u>** shall mean an order of the Court that has not been reversed, modified, amended or stayed, and as to which the time to appeal or to seek review or certiorari thereof has expired, and as to which no appeal, review or rehearing is pending.

1.25    **<u>Interest</u>** shall mean an existing ownership interest in Debtor.

1.26    **<u>Interest Holder</u>** shall mean a holder and owner of an existing Interest in Debtor.

1.27    **<u>Intervest</u>** shall mean an Intervest National Bank.

1.28    **<u>Legal Rate</u>** shall mean the applicable interest rate as set forth in 28 U.S.C. §1961 as of the Petition Date.

1.29    **<u>Lien</u>** shall mean a charge against or interest in property to secure payment of a debt or performance of an obligation.

1.30    "**<u>Payment Date</u>**" shall mean the date upon which the sale of the Property actually closes pursuant to the Confirmation Order, with the net sale proceeds to be used to fund the Debtor's obligations hereunder.  The Payment Date shall be simultaneous with the Effective Date or as close thereto as possible.

1.31    **<u>Petition Date</u>** shall mean July 15, 2009, the date of the filing of the Bankruptcy Case by the Debtor.

1.32    **<u>Plan</u>** shall mean this Plan of Reorganization, and any and all modifications and/or amendments hereto.

1.33    **<u>Professional Fees</u>** shall mean fees incurred by professionals retained in this case pursuant to Bankruptcy Court order.

1.34    **<u>Property</u>** shall mean that certain real property owned by the Debtor located at 170-174 Nagle Avenue, New York, New York.

1.35    **<u>Purchaser</u>** shall mean the Purchaser as defined in the Sale Contract.

1.36    **<u>"Receiver"</u>** shall mean Gregory Soumos, who was appointed as Receiver of the Property prior to the Petition Date and who has continued to operate and manage the Property after the Petition Date.

1.37    **<u>Sale Contract</u>** shall mean the sale contract annexed to the Plan as Exhibit A.

1.38    **<u>Secured Claim</u>** shall mean a Claim secured by a Lien on property included within the Debtor's Estate.

1.39    **<u>Secured Creditor</u>** shall mean the owner or holder of a Secured Claim.

1.40    **<u>Unsecured Claim</u>** shall mean a claim for which the Claimant does not hold (a) a valid, perfected and enforceable Lien, security interest or other interest in or encumbrance against property of the Debtor or the Debtor's Estate; (b) a right to setoff to secure the payment of such Claim.  An Unsecured Claim includes, but is not limited to, a Claim for damages resulting from rejection of any Executory Contract pursuant to Section 365 of the Bankruptcy Code.

1.41    **<u>Unsecured Creditor</u>** shall mean the owner or holder of an Unsecured Claim.

## <u>OVERVIEW OF PLAN</u>

This Plan is predicated upon a private sale of the Debtor's Property to a group of individuals or their designees (the "New Purchaser") pursuant to the Sale Contract for a total

purchase price of $10.2 million under 11 U.S.C. §363(b) and (f) and 11 U.S.C.§1123(a)(5) such that approval and confirmation of the Plan shall be deemed approval of the sale of the Property for all purposes. Based upon certain voluntary accommodations made by the Bank as the holder of a first mortgage, the Bank shall receive an assignment of mortgage plus the sum of $1,909,167 from the cash paid at closing of $2,500,000. The balance of this cash of $590,833 (hereinafter, the "Excess Cash") will be sufficient to pay all other claims in full and leave a surplus available for the Debtor's equity holders of approximately $212,045. Consistent with the ruling of the Supreme Court, confirmation of the Plan will precede the actual transfer of the Property so that the exemption under 11 U.S.C. §1146(a) shall properly apply.

**ARTICLE 2**

**CLASSIFICATION AND TREATMENT OF CLAIMS**

**Class 1: Real Estate Taxes**

2.1    **Classification** - Class 1 consists of the Secured Claims of the City of New York for unpaid real estate taxes, including recorded liens for unpaid real estate tax, water and sewer charges and related liens on the Debtor's Property.

2.2    **Treatment** - Class 1 Claims shall be paid in full plus interest at the applicable statutory rate on the Payment Date from the Excess Proceeds.

2.3    **Voting** –  The holder of the Class 1 Claim is unimpaired and is deemed to have accepted the Plan, pursuant to Section 1126(f) of the Bankruptcy Code.

**Class 2: Intervest Mortgage**

2.4    **Classification** - Class 2 consists of the first mortgage on the Property held by the Bank.

2.5   **Treatment** - Intervest shall be entitled to all of the rights, benefits and amounts due, as set forth more particularly in the Sale Contract. To this end, Intervest shall receive an assignment of the existing mortgage as modified to the extent of $7,700,000, plus payment of $1,909,167 from the sale proceeds at closing on the Payment Date.

2.6   **Voting** – The Holder of the Class 2 Claim is impaired, but has agreed to accept the Plan so long as the Bank receives the assignment of existing mortgage and sum of $1,909,167 on the Payment Date from the cash sale proceeds of $2,500,000 to be independently funded at closing by the New Purchaser. The holder of the Class 2 Claim is entitled to vote and has agreed to accept the plan.

### Class 3: Second Mortgage

2.7   **Classification** - Class 3 consists of the Claim of Andrew Glass Brokerage, which holds a second mortgage on the Property.

2.8   **Treatment** - Class 3 shall be paid the principal amount due, plus interest thereon as provided for in the subject note and mortgage in the estimated sum of $35,000 from Excess Cash.

2.9   **Voting** – The Holder of the Class 3 Claim is unimpaired and is deemed to have accepted the Plan.

### Class 4: Ford Motor Credit

2.10   **Classification** – Class 4 consists of the Claim of Ford Motor Credit, which holds an automobile loan secured by a 2007 Ford Mustang.

2.11   **Treatment** – Class 4 shall be paid the total amount due to cure and reinstate the Class 4 financing agreement under 11 U.S.C. §1124(2) of $6,096 from Excess Cash.

The Debtor shall continue to pay the amounts due under the financing agreement with funds to be contributed by the Debtor's Equity Holder.

2.12   **<u>Voting</u>** – The Holder of the Class 4 Claim is unimpaired and is deemed to have accepted the Plan.

### Class 5: Priority Claims

2.13   **<u>Classification</u>** - Class 5 consists of Allowed Priority Claims under Sections 507(a)(2),(3),(4),(5),(6),(7),and (8) of the Bankruptcy Code.

2.14   **<u>Treatment</u>** - Holders of Allowed Class 5 Claims shall be paid in full in Cash plus interest at the applicable statutory rate on the Effective Date from the Excess Cash in an amount that the Debtor estimates will not exceed $5,428.

2.15   **<u>Voting</u>** – Class 5 is unimpaired and is deemed to have accepted the Plan.

### Class 6: Unsecured Claims

2.16   **<u>Classification</u>** - Class 6 consists of Allowed Unsecured Claims.

2.17   **<u>Treatment</u>** - Class 6 shall be paid in full plus interest at the Legal Rate from the Petition Date in an amount the Debtor estimates will not exceed $102,264 in full settlement of all claims on the Payment Date, inclusive of interest.

2.18   **<u>Voting</u>** – Class 6 is unimpaired and is deemed to have accepted the Plan.

**Class 6: Equity Security Holders**

2.19    **Classification** -  Class 6 consists of Vasilios Roufanis, the Debtor's president and sole shareholder.

2.20    **Treatment** - The Class 7 Equity Holder shall be entitled to such surplus as may be available on the Payment Date after payment of Administration Claims, Class 1, Class 2, Class 3, Class 4, Class 5 and Class 6 Claims under the Plan, plus such other amounts that may be due by the Debtor under the Sale Contract.

2.21    **Voting** –  The Holder of Class 6 Equity Interests is impaired but has agreed to accept the Plan.

## ARTICLE 3

## ADMINISTRATIVE EXPENSES

3.1    Allowed Administrative Expenses (including Receiver Fees, Receiver Counsel Fees and the Debtor's Professional Fees) anticipated to total $110,000 shall be paid in full from Excess Cash on the Payment Date, or the date such Administrative Expense becomes Allowed, except to the extent that the holder of an Allowed Administrative Expense agrees to a different treatment; provided, however, that Allowed Administrative Expenses representing obligations incurred in the ordinary course of business shall be paid in full or performed by the Receiver in the ordinary course of business or pursuant to the terms and conditions of the particular transaction.  Any fees or charges assessed against the Debtor's Estate under Chapter 123, Title 28, United States Code shall be paid in full as they come due or from either the funds collected by the Receiver or the sale proceeds.  In addition, at closing the security deposits of the Debtor's tenants shall be replenished as set forth in Exhibit A to the Plan, totaling $120,000.

# ARTICLE 4

## MEANS FOR IMPLEMENTATION OF THE PLAN

4.1     **Sale**.  The Property shall be sold and transferred to the New Purchaser pursuant to the Sale Contract.  The Debtor shall take all necessary steps, and perform all necessary acts, to consummate the terms and conditions of the Plan, including, without limitation, effectuating a closing on the Sale Contract based upon approval of this Plan and entry of the Confirmation Order.  In furtherance of the Plan and as the means of funding the obligations due hereunder, the Property will be sold to the Purchaser or its nominee pursuant to the Sale Contract, a copy of which is annexed to the Plan as Exhibit A.  The sale shall be free and clear of any liens claims and encumbrances, with such liens, claims and encumbrances, if any, to attach to the cash proceeds of sale.  The sale shall close on or before the Effective Date, subject to such extensions as may be necessary to consummate the sale.  The Debtor hereby authorizes the Bank to cause to be paid or escrowed on the Debtor's behalf, all distributions required hereunder to creditors from the Excess Cash at the time of closing.

4.2     **Receiver**. On the Effective Date, the receivership shall be deemed concluded and terminated, whereupon the Receiver shall be deemed discharged.  As such, any and all interests and rights in and to all property, held by or entitled to be received by the Receiver, shall be transferred to the Debtor after payment of all outstanding debts and obligations incurred by the Receiver prior to closing in the ordinary course of business.  On the Effective Date, the Receiver shall provide the Debtor with a final accounting as to all sums collected by the Receiver during the receivership and the application thereof.  Notwithstanding the foregoing, the Receiver shall be entitled to hold back from turnover to the Debtor, the

11

claimed amount of receivership fees and expenses, including legal fees, pending approval of such fees by the Bankruptcy Court.

4.3    **Revesting of Assets.**  Except as otherwise provided herein concerning the Sale of Property and distribution of the cash proceeds pursuant to the terms hereof, any other residual assets, if any, (including potential surplus in the Receiver's Account), shall vest in the Debtor free and clear of all Liens, Claims and encumbrances if and when all required distributions made hereunder are paid in full.  Any and all Liens, Claims and encumbrances that have not been expressly preserved under the Plan shall be deemed extinguished as of such date. Except as otherwise provided herein, as of the Effective Date, all property of the Debtor shall be free and clear of all Claims and Interests of Creditors, except for the obligations that are imposed under the Plan or by a Final Order of the Bankruptcy Court.

4.4    **Execution of Documents**.  The Debtor shall be authorized to execute, in the name of any necessary party, any notice of satisfaction, release or discharge of any Lien, Claim or encumbrance not expressly preserved in the Plan and deliver such notices to any and all federal, state and local governmental agencies or departments for filing and recordation.

4.5    **Filing of Documents.**  Each and every federal, state and local governmental agency or department shall be authorized to accept and record any and all documents and instruments necessary, useful or appropriate to effectuate, implement and consummate the transaction contemplated by the Plan, including, but not limited to any and all notices of satisfaction, release or discharge of any Lien, Claim or encumbrance not expressly preserved by the Plan, and the Confirmation Order.

4.6    **11 U.S.C. 1146** (a).  Under the Plan, pursuant to Bankruptcy Code § 1146(a) the issuance, transfer or exchange of any securities, instruments or documents, (b) the creation of any other Lien, mortgage, deed of trust or other security interest, (c) the making or assignment of any lease or sublease or the making or delivery of any deed or other instrument of transfer under, pursuant to, in furtherance of, or in connection with, the Plan, including, without limitation, any deeds, bills of sale or assignments executed in connection with the purchase of the Property by the Purchaser and any other transaction contemplated under the Plan or the re-vesting, transfer or sale of any real or personal property of the Debtor pursuant to, in implementation of, or as contemplated in the Plan, and (d) the issuance, renewal, modification or securing of indebtedness by such means, and the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan. Consistent with the foregoing, and the Supreme Court interpretation of the Bankruptcy Code § 1146(a) exemption, each recorder of deeds or similar official for any county, city or governmental unit in which any instrument hereunder is to be recorded, any instrument of transfer of the title to the Property, pursuant to the Confirmation Order, shall accept such instrument, without requiring the payment of any filing fees, documentary stamp tax, deed stamps, stamp tax, transfer tax, mortgage tax, intangible tax or similar tax, including without limitation New York City Real Property Transfer Tax and New York State Documentary Tax.  The Confirmation Order shall expressly reference and incorporate this provision of the Plan so it is absolutely clear that the Debtor properly qualifies for the Section 1146(a) exemption.

## ARTICLE 5

### PROVISIONS FOR THE RETENTION, ENFORCEMENT AND SETTLEMENT OF CLAIMS BELONGING TO THE DEBTOR OR THE DEBTOR'S ESTATE

5.1     All rights pursuant to Sections 502, 544, 545 and 546 of the Bankruptcy Code, all preference claims pursuant to Section 547 of the Bankruptcy Code, all fraudulent transfer claims pursuant to Section 548 of the Bankruptcy Code, and all claims relating to post-petition transactions under Section 549 of the Bankruptcy Code are hereby preserved for the benefit of the Debtor.

## ARTICLE 6

### PROVISIONS FOR THE RESOLUTION OF DISPUTED CLAIMS AND OBJECTIONS TO PROOFS OF CLAIM

6.1     **Objections to Claims**.  Except for the Claim filed by the IRS, the Debtor does not anticipate any objections to claims, but in an abundance of caution, the Debtor reserves the right to object or contest the allowance of any Claims, except the claims of the Bank, provided an objection is filed prior to Confirmation and reserves are established in the event the objection is still pending on the Effective Date.

## ARTICLE 7

### EXECUTORY CONTRACTS AND UNEXPIRED LEASES

7.1     **Assumption**.  All tenant leases shall be deemed assumed and assigned to the Purchaser under the Sale Contract.  All other executory contracts not assumed before the Effective Date, including, shall be deemed rejected on the Effective Date.

# ARTICLE 8

## RETENTION OF JURISDICTION

8.1 **Retention of Jurisdiction**. The Court shall have jurisdiction over all matters arising under, arising in, or relating to Debtor Bankruptcy Case including, but not limited to, proceedings:

8.1.1 To consider any modification of the Plan under section 1127 of the Bankruptcy Code;

8.1.2 To hear and determine all Claims, controversies, suits and disputes against the Debtor to the full extent permitted under 18 U.S.C. §1334 and 28 U.S.C. §157.

8.1.3 To hear, determine and enforce all objections to claims and causes of action which may exist on behalf of the Debtor or the Debtor's estate, not affecting the Property or the rights of creditors hereunder;

8.1.4 To hear and determine all requests for compensation and/or reimbursement of expenses which may be made;

8.1.5 To enforce the Confirmation Order;

8.1.6 To enter an order concluding and terminating the Bankruptcy Case;

8.1.7 To correct any defect, cure any omission, or reconcile any inconsistency in the Plan, or the Confirmation Order;

8.1.8 To determine all questions and disputes regarding title to the assets of the Debtor conveyed hereunder.

8.1.9     To re-examine Claims which may have been allowed for purposes of voting, and to determine objections which may be filed to any Claims.

## ARTICLE 9

## GENERAL PROVISIONS

9.1     **Headings**.  The headings in the Plan are for convenience of reference only and shall not limit or otherwise affect the meaning of the Plan.

9.2     **Contents of Confirmation Order**.  The Confirmation Order may contain various equitable and injunctive provisions as may be necessary to implement the Plan.

9.3     **No Payment of Disputed Claims**.  This Plan contemplates the payment of Allowed Claims only.  No Disputed Claims shall be paid, nor shall distributions be made to a creditor holding a Disputed Claim, until such Claim, or any part thereof, becomes an Allowed Claim, if ever.

9.4     **Calculation of Time Periods**.  Bankruptcy Rule 9006 is incorporated herein for purposes of calculating the dates set forth herein.

## ARTICLE 10

## MODIFICATIONS

10.1     **Modification of Plan.**  The Debtor may seek amendments or modifications to the Plan in accordance with section 1127 of the Bankruptcy Code at any time prior to the Confirmation Date.  After the Confirmation Date, the Debtor may seek to remedy any defect or omission or reconcile any inconsistencies in the Plan or in the Confirmation Order, in such manner as may be necessary to carry out the purposes and intent of the Plan.

## ARTICLE 11

## CLOSING THE CASE

11.1    Upon substantial consummation, the Debtor may move for a final decree

to close the Bankruptcy Case and to request such other orders as may be just.

Dated:    New York, New York
              December 30, 2009

**ICON REALTY CORP.**
**Debtor and Debtor in Possession**

By:    s/Vasilios Roufanis, President

**BACKENROTH FRANKEL & KRINSKY,**
**LLP**, **Attorneys for the Debtor**

By:    s/Mark Frankel
           Mark A. Frankel
           489 Fifth Avenue
           New York, New York 10017
           (212) 593-1100

F:\Icon\PLAN.006.wpd

Exhibit A

# CONTRACT OF SALE

CONTRACT dated the 18th day of December, 2009 by and among Icon Properties Corp., a New York corporation having an address at c/o Vasillos Roufanis, POB 090-633, Fort Hamilton, Brooklyn, New York 11209 ("Seller"), Miao-Ling Lin, Yu Xin Wu and Min Wu, as individuals, having an address at c/o Nolan Cheng, Esq., 11 East Broadway, Suite 7C, New York, NY 10038 ("Purchaser"), and Intervest National Bank ("Existing Mortgagee"), having an address at One Rockefeller Plaza, Suite 400, New York, New York 10020.

## WITNESSETH:

WHEREAS, Seller is the owner of the Premises (as hereinafter defined).

WHEREAS, the Premises are the subject of a foreclosure proceeding instituted by the Existing Mortgagee entitled Intervest National Bank v. The Icon Realty Corp. et al., Supreme Court of the State of New York, New York County, Index No. 115491/08 (the "Foreclosure Proceeding").

WHEREAS, Gregory Soumas was appointed, and as of this date, remains the rent receiver for the Premises ("Receiver").

WHEREAS, on July 15, 2009, Seller filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §101 et seq. (as amended, the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"), which is being administered under Case No. 09-14485 in the Bankruptcy Court.

WHEREAS, this Contract is being entered into by Seller and Purchaser to provide for the sale of the Premises to Purchaser, with the consent and participation of Existing Mortgagee, pursuant to Seller's confirmed Chapter 11 Plan of Reorganization (the "Plan").

NOW, THEREFORE, in consideration of the mutual covenants herein set forth, and for other good and valuable consideration (the receipt and sufficiency of which are hereby acknowledged, the parties intending to be legally bound hereby agree as follows:

**Section 1.      Sale of Premises and Acceptable Title**

§1.01. Seller shall sell to Purchaser, and Purchaser shall purchase from Seller, at the price and upon the terms and conditions set forth in this contract: (a) the parcel of land more particularly described in *Schedule A* attached hereto ("Land"); (b) all buildings and improvements situated on the Land (collectively, "Building"); (c) all right, title and interest of Seller, if any, in and to the land lying in the bed of any street or highway in front of or adjoining the Land to the center line thereof and to any unpaid award for any taking by condemnation or any damage to the Land by reason of a change of grade of any street or highway; (d) the appurtenances, including all development rights, if any, easements, licenses, permits, approvals and all the estate and rights of Seller in and to the Land and Building; and (e) all right, title and

interest of Seller, if any, in and to the fixtures, equipment and other personal property attached or appurtenant to the Building (collectively, "Premises"). The Premises are located at or known as 170-174 Nagle Avenue, New York, New York.

§1.02. Seller shall convey and Purchaser shall accept fee simple title to the Premises in accordance with the terms of this Contract, subject only to: (a) the matters set forth in _Schedule B_ attached hereto; and (b) such other matters as (i) the title insurer specified in _Schedule D_ attached hereto (or if none is so specified, then any title insurer licensed to do business by the State of New York) shall be willing, without special premium, to omit as exceptions to coverage or to except with insurance against collection out of or enforcement against the Premises (collectively, "Permitted Exceptions").

**Section 2.**     **Purchase Price, Acceptable Funds, Existing Mortgage and Escrow of Downpayment**

§2.01. The purchase price ("Purchase Price") to be paid by Purchaser for the Premises as provided in _Schedule C_ attached hereto is Ten Million Two Hundred Thousand and 00/100 $10,200,000.00. _Schedule C_ provides for the acceptance of title by Purchaser subject to the Existing Mortgage in the reduced amount of $7,700,000.00 (as defined and more particularly described in §21).

§2.02.     All monies payable under this Contract, unless otherwise specified in this Contract, shall be paid, at the election of Existing Mortgagee, by (a) official bank check, drawn on or by a bank which is a member of the New York City Clearing House Association or (b) wire transfer of immediately available federal funds to the account of Existing Mortgagee, (or as otherwise directed by the Existing Mortgagee) in accordance with instructions to be furnished by the Existing Mortgagee to Purchaser prior to the Closing Date.

§2.03. (a)     The sum paid under paragraph (a) of _Schedule C_ shall be paid by check or checks, drawn to the order of and delivered to Stewart Title Insurance Company ("Escrowee") (such sum together with any interest earned thereon shall hereinafter be referred to as the "Downpayment"). If the check fails collection, this Contract, at the option of Existing Mortgagee, shall be terminated. The Escrowee shall hold the proceeds thereof in escrow in a special bank account (or as otherwise agreed in writing by Seller, Purchaser, Existing Mortgagee and Escrowee) until the Closing or sooner termination of this Contract and shall pay over or apply such proceeds in accordance with the terms of this section. Escrowee need not hold such proceeds in an interest-bearing account, but if any interest is earned thereon, such interest shall be paid to the same party entitled to the escrowed proceeds, and the party receiving such interest shall pay any income taxes thereof. The tax identification numbers of the parties are either set forth in _Schedule D_ or shall be furnished to Escrowee upon request. At the Closing, such proceeds and the interest earned thereon, if any, shall be paid by Escrowee to the Existing Mortgagee. If for any reason the Closing does not occur and any party, including Existing Mortgagee, makes a written demand upon Escrowee for payment of such amount, Escrowee shall give written notice to the other parties of such demand. If Escrowee does not receive a written objection from one or more of the other parties to the proposed payment within ten (10) business days after the giving of such notice, Escrowee is hereby authorized to make such

2

payment. If Escrowee does receive such written objection within such ten (10) day period or if for any other reason Escrowee in good faith shall elect not to make such payment, Escrowee shall continue to hold such amount until otherwise directed by written instructions from the Seller, Purchaser and Existing Mortgagee or a final judgment of a court. However, Escrowee shall have the right at any time to deposit the escrowed proceeds and interest thereon, if any, with the clerk of the Supreme Court of the county in which the Land is located. Escrowee shall give written notice of such deposit to Seller, Purchaser and the Existing Mortgagee. Upon such deposit Escrowee shall be relieved and discharged of all further obligations and responsibilities hereunder.

(b)     The parties acknowledge that Escrowee is acting solely as a stakeholder at their request and for their convenience, that Escrowee shall not be deemed to be the agent of any of the parties, and that Escrowee shall not be liable to any of the parties for any act or omission on its part unless taken or suffered in bad faith, in willful disregard of this Contract or involving gross negligence. Seller and Purchaser shall jointly and severally indemnify and hold Escrowee harmless from and against all costs, claims and expenses, including reasonable attorneys' fees, incurred in connection with the performance of Escrowee's duties hereunder, except with respect to actions or omissions taken or suffered by Escrowee in bad faith, in willful disregard of this Contract or involving gross negligence on the part of Escrowee.

(c)     Escrowee has acknowledged agreement to these provisions by signing in the place indicated on the signature page of this Contract, and has acknowledged receipt of the Downpayment.

## Section 3.     The Closing

§3.01. The closing of title pursuant to this Contract ("Closing") shall take place at 10:00 a.m. (New York City time) February 2, 2010 (the actual date of the Closing being herein referred to as "Closing Date"). Notwithstanding the foregoing, in the event the Confirmation Order (as hereafter defined) is not issued on or before the Closing Date, and the Existing Mortgagee extends the date for receipt of the Confirmation Order as provided in §20.03, then the Closing shall be extended to the earlier of (i) ten (10) business days after Purchaser or Purchaser's attorneys receive written notice of the entry of the Confirmation Order and (ii) March 1, 2010 (the "Extended Closing Date"), time shall be of the essence as to Purchaser's performance on the Closing Date and the Extended Closing Date, if applicable. In the event the Closing Date is extended as provided in this §3.01, the Extended Closing Date shall for all purposes herein be deemed to be the Closing Date and all references to the Closing Date shall mean the Extended Closing Date, if applicable.

## Section 4.     Representations and Warranties of Seller

Seller represents and warrants to Purchaser as follows:

§4.01. Based upon information provided by the Receiver, the information concerning written leases (which together with all amendments and modifications thereof are collectively referred to as "Leases") and any tenancies in the Premises not arising out of the Leases

3

(collectively, "Tenancies") set forth in Schedule E attached hereto ("Rent Schedule") is accurate in all material respects as of the date hereof to the best of Seller's knowledge. Seller has not collected any prepaid rent for any period following the date hereof. Seller represents that it is no longer in possession of any Leases.

§4.02. Based upon information provided by the Receiver, attached hereto as *Schedule F* is a list of all employees presently employed at the Premises, and the information contained therein is accurate in all material respects as of the date set forth therein or, if no date is set forth therein, as of the date hereof, and, except as otherwise set forth in such schedule, none of such employees is covered by a union Contract.

§4.03. Based upon information provided by the Receiver, attached hereto as *Schedule G* is a schedule of all material service, maintenance, supply and management contracts affecting the Premises ("Service Contracts"), and the information set forth therein is accurate in all material respects as of the date hereof, to the best of Seller's knowledge.

§4.04. Seller is a corporation duly formed and in good standing under the laws of the State of New York, and has the requisite power and authority to enter into and to perform the terms of this Contract, subject to the entry of the Confirmation Order by the Bankruptcy Court.

§4.05. Seller is not a "foreign person" within the meaning of §1445 of the Internal Revenue Code 1986, as amended, or any regulations promulgated thereunder (collectively "the Code").

**Section 5.      Representations and Acknowledgments of Purchaser**

§5.01. Purchaser has inspected the Premises, is fully familiar with the physical condition and state of repair thereof, and, shall accept the Premises "as is" and in their present condition, subject to reasonable use, wear, tear and natural deterioration between now and the Closing Date, without any reduction in the Purchase Price for any change in such condition by reason thereof subsequent to the date of this Contract.

§5.02. Before entering into this Contract, Purchaser has made such examinations of the Premises, the operation, income and expenses thereof and all other matters affecting or relating to this transaction as Purchaser deemed necessary. In entering into this Contract, Purchaser has not been induced by and has not relied upon any representations, warranties or statements, whether express or implied, made by Seller or any agent, employee or other representative of Seller or by any broker or any other person representing or purporting to represent Seller, which are not expressly set forth in this Contract, whether or not any such representations, warranties or statements were made in writing or orally.

§5.03. Purchaser will be, at Closing, a limited liability company duly formed and in good standing and existing under the laws of the State of New York, and will have the requisite power and authority to enter into and perform the terms under this Contract.

§5.04. If any space is vacant on the Closing Date, Purchaser shall accept the Premises

subject to such vacancy.

§5.05 Seller does not warrant that any particular Lease or Tenancy will be in force or effect at the Closing or that the tenants will have performed their obligations thereunder. The termination of any Lease or Tenancy prior to the Closing by reason of the tenant's default shall not affect the obligations of Purchaser under this Contract in any manner or entitle Purchaser to an abatement of or credit against the Purchase Price or give rise to any other claim on the part of Purchaser.

**Section 6.  Intentionally Omitted**

**Section 7.  Responsibility for Violations**

§7.01. Purchaser agrees to accept title to the Premises, subject to all notes or notices of violations of law or governmental ordinances, orders or requirements by any governmental department, agency or bureau having jurisdiction as to conditions affecting the Premises and to all conditions which may give rise to such notes or notices of violations (collectively "Violations"). The existence of any Violations shall not affect the obligation of Purchaser under this Contract in any manner or entitle Purchaser to an abatement of or credit against the purchase price, or give rise to any other claim on the part of Purchaser. Notwithstanding the foregoing, Seller shall be responsible for payment of all fines and penalties which are noted as a liquidated amount in the title report issued by Purchaser's title insurer as designated in *Schedule D*. In the event the title report reflects any boiler violations affecting the Premises that do not note a liquidated amount and are not covered under the preceding sentence, then Purchaser shall receive, at Closing, a credit in the amount of $1,000.00 for each such violation, but in no event more than $2,000.00 in the aggregate.

§7.02. If required, Seller, upon written request by Purchaser, shall promptly furnish to Purchaser written authorizations to make any necessary searches for the purposes of determining whether notes or notices of violations have been noted or issued with respect to the Premises or liens have attached thereto.

**Section 8.  Destruction, Damage or Condemnation**

§8.01. The provisions of §5-1311 of the General Obligations Law shall apply to the sale and purchase provided for in this Contract.

**Section 9.  Covenants of Seller**

Seller covenants that between the date of this Contract and the Closing:

§9.01. Seller shall not withdraw, settle or otherwise compromise any protest or reduction proceeding affecting real estate taxes assessed against the Premises for any fiscal period in which the Closing is to occur or any subsequent fiscal period without the prior written consent of Purchaser and Existing Mortgagee. Real estate tax refunds and credits received after the Closing Date which are attributable to the fiscal tax year during which the Closing Date occurs shall be

apportioned between Seller and Purchaser, after deducting the expenses of collection thereof and any payments due to Seller shall be paid to Existing Mortgagee. Purchaser shall execute any and all consents or other documents as may be requested by Seller and/or the Existing Mortgagee and do any act or thing necessary for the collection of such refunds and credits by Seller and the Existing Mortgagee. Seller acknowledges and agrees that any refunds or credits and/or benefits relating to the period occurring prior to the Closing, shall be the property of, and payable to, the Existing Mortgagee and shall not be deemed to be part of Seller's Share (as hereinafter defined). The provisions of this §9.01 shall survive the Closing.

§9.02. Seller shall not sell, mortgage, pledge, hypothecate or otherwise transfer, dispose of or voluntarily encumber or consent to the encumbrance of, or any part of the Premises or any interest therein. Seller shall not file or record any covenant, restriction, easement or other agreement affecting title without obtaining Purchaser's and Existing Mortgagee's prior written consent. Purchaser's and Existing Mortgagee's consent shall not be required in connection with the removal from record of any title encumbrances that are not Permitted Exceptions.

**Section 10.    Seller's Closing Obligations**

At the Closing, Seller shall deliver or cause to be delivered the following to Purchaser:

§10.01. A statutory form of bargain and sale deed without covenant against grantor's acts, containing the covenant required by §13 of the Lien Law, and properly executed in proper form for recording so as to convey the title required by this Contract.

§10.02. All Leases in Seller's possession and in the Receiver's possession.

§10.03. A schedule provided by the Receiver updating the Rent Schedule and setting forth all arrears in rents and all prepayments of rents.

§10.04. All Service Contracts in Seller's possession, and in the Receiver's possession, which are in effect on the Closing Date and which are assignable by Seller.

§10.05. An assignment to Purchaser, of all of the interests of Seller in the Leases ("Assignment of Leases") in the form annexed hereto as *Exhibit A*.

§10.06. An Assignment to Purchaser of all of the interests of Seller in the Service Contracts ("Assignment of Service Contracts"), which are then in effect and assignable by Seller in the form annexed hereto as *Exhibit B*.

§10.07. A Real Property Transfer Report (State of New York State Board of Real Property Services) Form RP-5217 ("Equalization Form"), if required.

§10.08. A Combined Real Estate Transfer Tax Return and Credit Line Mortgage Certificate Form TP-584 ("State Transfer Tax Return"), if required.

§10.09.   A New York City Department of Finance Real Premises Transfer Tax Return ("City Transfer Tax Return"), if required.

§10.10.   A certification of non-foreign status, in the form required by §1445 of the Code.

§10.11.   To the extent they are then in Seller's possession and/or the Receiver's possession and not posted at the Premises, certificates, licenses, permits, authorizations and approvals issued for or with respect to the Premises by governmental and quasi-governmental authorities having jurisdiction.

§10.12.   Such affidavits as Purchaser's title company shall reasonably require in order to omit from its title insurance policy all exceptions for judgments, bankruptcies or other returns against persons or entities whose names are in the same as or similar to Seller's name.

§10.13.   Subject to §17.01, checks to the order of the appropriate officers in payment of all applicable real property transfer taxes and copies of any required tax returns therefor executed by Seller, which checks shall be certified or official bank checks, unless Seller elects to have Purchaser pay any of such taxes and credit Purchaser with the amount thereof.

§10.14.   A letter, executed by Seller or by its agent, or by the Receiver advising the tenants of the sale of the Premises to Purchaser and directing that future rents, bills and other correspondence should thereafter be sent to Purchaser or as Purchaser may direct.

§10.15.   A copy of the Confirmation Order.

§10.16.   Any other documents required by this Contract to be delivered by Seller.

§10.17.   To the extent received by Seller and/or the Receiver, estoppel certificates from commercial tenants.   Existing Mortgagee shall direct the Receiver and/or the Receiver's managing agent to make a request from each of the commercial tenants for an estoppel certificate.  Notwithstanding the foregoing, in the event that either or both of the following shall occur (each hereafter referred to as an "**Estoppel Event**"), (i) the failure to obtain an estoppel certificate from any or all of the commercial tenants and/or (ii) if any estoppel certificate received from a commercial tenant contains information relating to a default on the part of Seller and/or the tenant and/or contains other information which may be inconsistent with information contained in this Contract, Purchaser acknowledges and agrees that such Estoppel Event shall not be treated as a default by Seller under this Contract, or in any way be construed as a basis for Purchaser not close title pursuant to the terms of this Contract or otherwise entitle Purchaser to an abatement or reduction in the Purchase Price.

§10.18.   A list of any attorneys handling any non-payment or eviction actions against any tenant of the Premises and, at Purchaser's request, an assignment of any such actions.  Seller and/or the Receiver, as may be applicable, shall execute such documentation as may be required to effect an assignment of any such action and substitution of counsel.

I:\Users\Share\Intervest\Loans\Intervest National Bank\170-174 Nagle Avenue, NY\Contract of Sale – Draft 12-18-09.Wu.doc

**Section 11.    Purchaser's Closing Obligations**

At the Closing, Purchaser shall:

§11.01.  Deliver to the Existing Mortgagee payment of the balance of the Purchase Price payable at the Closing, as adjusted for apportionments under §12.

§11.02.  Deliver to Seller the Assignment of Leases which shall be duly executed by Purchaser.

§11.03.  Deliver to Seller the Assignment of Service Contracts which shall be duly executed by Purchaser.

§11.04.  Deliver to Seller the Equalization Form, State Transfer Tax Return and City Transfer Tax Return, each duly executed by Purchaser, if required.

§11.05.  Deliver to Seller, Existing Mortgagee and the Receiver a receipt and indemnity agreement in respect of the security deposits turned over to Purchaser pursuant to §12.04.

§11.06.  Deliver to the Existing Mortgagee, the documentation and instruments as may be required by the Existing Mortgagee in connection with the Assumption (as such term is defined and more particularly described in §21).

§11.07.  Cause the deed to be recorded, duly complete all required real property transfer tax returns and cause all such returns and checks (as provided in §2.02(a)) in payment of such taxes to be delivered to the appropriate officers at the Closing, if required.

§11.08.  Deliver any other documents required by this Contract to be delivered by Purchaser.

**Section 12.    Apportionments**

§12.01.  The following apportionments shall be made between the Receiver and the Purchaser:

(a)    rents and Additional Rents (as defined in §12.03) as and when collected;

(b)    real estate taxes, assessments, water charges, sewer rents and vault charges, if any, on the basis of the fiscal period for which assessed, except that if there is a water meter on the Premises, apportionment at the Closing shall be based on the last available reading, subject to adjustment after the Closing when the next reading is available;

(c)    wages, vacation pay, pension and welfare benefits and other fringe benefits of all persons employed at the Premises whose employment was not terminated at or prior to the Closing;

(d)     value of fuel stored on the Premises, at the price then charged by Seller's supplier, including any taxes;

(e)     charges under transferable Service Contracts or permitted renewals or replacements thereof;

If the Closing shall occur before a new tax rate is fixed, the apportionment of taxes at the Closing shall be upon the basis of the old tax rate for the preceding period applied to the latest assessed valuation. Promptly after the new tax rate is fixed, the apportionment of taxes shall be recomputed. Any discrepancy resulting from such recomputation and any errors or omissions in computing apportionments at Closing shall be promptly corrected, which obligations shall survive the Closing.

§12.02. If any tenant is in arrears in the payment of rent and/or Additional Rents on the Closing Date, rents received from such tenant after the Closing shall be payable to Purchaser. If rents and/or Additional Rents or any portion thereof are received by Seller and/or the Receiver, same shall be promptly paid to Purchaser, which obligation shall survive the Closing. Such funds, if any, as collected, shall constitute trust funds. Seller and Existing Mortgagee shall instruct the Receiver to deliver to Purchaser any rental arrears received from tenants after the Closing.

§12.03. If any tenants are required to pay percentage rents, escalation charges for real estate taxes, insurance, operating expenses, or other charges of a similar nature ("Additional Rents") and any Additional Rents are collected by Purchaser after the Closing which were attributable in whole or in part to any period prior to the Closing, then Purchaser shall promptly pay to the Receiver the proportionate share thereof, less the proportionate share of any reasonable attorneys' fees, costs and expenses of collection thereof, which obligation shall survive the Closing. If any such Additional Rents are collected by the Receiver after the Closing which were attributable in whole or in part to any period following the Closing, then Seller and Existing Mortgagee shall promptly instruct the Receiver to deliver same to Purchaser. Such funds, if any, as collected, shall constitute trust funds.

§12.04. Purchaser has been advised that the Receiver did not receive and is not in possession of any security deposits for leases entered into prior to the Receiver's appointment. The Receiver shall transfer to Purchaser, at or subsequent to the Closing, those tenant security deposits in its possession, together with any interest accrued thereon, by either (a) a direct assignment of the bank accounts in which the same are deposited and delivery of all necessary and appropriate documentation relating to such accounts or (b) paying to Purchaser, by separate check, the amount of such security deposits in the Receiver's possession (together with any interest accrued thereon). With respect to those security deposits deposited by tenants pursuant to leases entered into prior to the appointment of the Receiver and not in the Receiver's possession ("Pre-Receiver Securities"), at Closing, Purchaser shall receive a payment by separate check in the amount of the Pre-Receiver Securities. Seller and Receiver agree that the Pre-Receiver Securities shall be an amount equal to (i) with respect to the residential tenancies, one month's rent for each such residential tenancy and (ii) with respect to the commercial tenancies, the amount of securities required under such commercial tenants' leases. Purchaser agrees to

9

defend, indemnify and hold harmless Seller, Receiver and Existing Mortgagee from and against any and all claims, demands, causes of action, losses, damages, liabilities, costs and expenses (including, without limitation, reasonable attorneys' fees and disbursements) in connection or arising out of tenant security deposits, to the extent turned over and/or paid to Purchaser as hereinabove provided.

§12.05.  Purchaser acknowledges that (i) Seller's interest under the service contracts and leases are currently subject to assumption or rejection in bankruptcy pursuant to 11 U.S.C. §365, and (ii) the apportionments shall be adjusted with the Existing Mortgagee and not the Seller.

§12.06.  Seller and Purchaser acknowledge and agree that there shall be no apportionments between Seller and Purchaser for interest, late fees and escrows under the Existing Mortgage in respect to the period ending on the date immediately preceding the Closing Date.

**Section 13.  Objections to Title, Failure of Seller or Purchaser to Perform and Vendee's Lien**

§13.01.  Purchaser shall promptly order an examination of title and shall cause a copy of the title report to be forwarded to Seller's attorney and Existing Mortgagee's attorney upon receipt. Seller, with Existing Mortgagee's consent, shall be entitled to a reasonable adjournment or adjournments of the Closing for up to sixty (60) days in the aggregate to remove any defects in or objections to title noted in such title report (and which are not Permitted Exceptions) and any other defects or objections which may be disclosed on or prior to the Closing Date not otherwise addressed by the Confirmation Order.

§13.02.  If Seller shall be unable to convey title to the Premises at the Closing in accordance with the provisions of this Contract or if Purchaser shall have any other grounds under this Contract for refusing to consummate the purchase provided for herein, Purchaser, nevertheless, may elect to accept such title as Seller may be able to convey without a credit or abatement against the Purchase Price. If Purchaser shall not so elect, Purchaser may terminate this Contract and the sole liability of Seller shall be to refund the Downpayment to Purchaser. Seller shall not be required to bring any action or proceeding or to incur any expense to cure any title defect other than any encumbrances or liens created in violation of §9.02.

§13.03.  Any unpaid taxes, assessments, water charges and sewer rents, together with the interest and penalties thereon to a date not less than two (2) business days following the Closing Date, and any other liens and encumbrances which Seller is obligated to pay and discharge or which are against corporations, estates or other persons in the chain of title, together with the cost of recording or filing any instruments necessary to discharge such liens and encumbrances of record, may be paid out of the proceeds of the monies payable at the Closing if Seller delivers to Purchaser on the Closing Date official bills for such taxes, assessments, water charges, sewer rents, interest and penalties and instruments in recordable form sufficient to discharge any other liens and encumbrances of record. Upon request made before the Closing, Purchaser shall provide at the Closing separate checks (complying with §2.02) for the foregoing payable to the order of the holder of any such lien, charge or encumbrance.

10

If Purchaser's title insurance company is willing to insure that such charges, liens and encumbrances will not be collected out of or enforced against the Premises, then, Seller shall have the right in lieu of payment and discharge to deposit with the title insurance company such funds or assurances or such indemnities or guarantees, or to pay such special or additional premiums as the title insurance company may require in order to so insure. In such case the charges, liens and encumbrances with respect to which the title insurance company has agreed so to insure shall not be considered objections to title.

§13.04. If Purchaser shall default in the performance of its obligation under this Contract to purchase the Premises, the sole remedy of Seller shall be to retain the Downpayment as liquidated damages for all loss, damage and expense suffered by Seller, including without limitation the loss of its bargain. In such event, the Downpayment shall be delivered to and shall be the property of the Existing Mortgagee and will be applied in reduction of principal of the Existing Mortgage (as hereinafter defined).

§13.05. If Seller shall default in the performance of its obligation under this Contract, Purchaser's sole and exclusive remedy shall be either (i) to instruct Escrow Agent to pay to Purchaser the Downpayment in which event Seller shall be released from any further liability to Purchaser hereunder other than any arising under §14, or (ii) to seek specific performance, Purchaser hereby specifically waiving any and all rights and remedies at law, including, without limitation, damages.

## Section 14.    Broker

§14.01. If a broker is specified in *Schedule D*, Seller and Purchaser mutually represent and warrant that such broker is the only broker with whom they have dealt in connection with this Contract and that neither Seller nor Purchaser knows of any other broker who has claimed or may have the right to claim a commission in connection with this transaction, unless otherwise indicated in *Schedule D*. The commission of such broker shall be paid pursuant to separate agreement by the party specified in *Schedule D*. If no broker is specified in *Schedule D*, the parties acknowledge that this Contract was brought about by direct negotiation between Seller and Purchaser and that neither Seller nor Purchaser knows of any broker entitled to a commission in connection with this transaction. Unless otherwise provided in *Schedule D*, Seller and Purchaser shall indemnify and defend each other and Existing Mortgagee against any costs, claims or expenses, including attorneys' fees, arising out of the breach on their respective parts of any representations, warranties or agreements contained in this paragraph.     The representations and obligations under this paragraph shall survive the Closing or, if the Closing does not occur, the termination of this Contract.

## Section 15.    Notices

§15.01. All notices, demands, requests, consents, approvals or other communications (for the purposes of this Section collectively referred to as "Notices") required or permitted to be given hereunder or which are given with respect to this Contract, in order to constitute effective notice to the other party, shall be in writing and shall be deemed to have been given when (a)

personally delivered with signed delivery receipt obtained, (b) when transmitted by facsimile machine, if followed by one of the other means set forth in this §15 before the end of the first business day thereafter, with printed confirmation of successful transmission to the appropriate facsimile number listed below as obtained by the sender from the sender's facsimile machine, (c) upon receipt, when sent by prepaid reputable overnight courier which maintains a tracking system or (d) three (3) days after the date so mailed if sent postage prepaid by registered or certified mail, return receipt requested, in each case addressed as set forth in *Schedule D* or as Seller, Purchaser or Existing Mortgagee shall otherwise have given notice as herein provided. Notices may be sent by the attorneys for the respective parties and each such Notice so served shall have the same force and effect as if sent by such party.

**Section 16.  Limitations on Survival of Representations, Warranties, Covenants and other Obligations**

§16.01. Except as provided in §14, 22 and 24.03 hereof, no representations, warranties, covenants or other obligations of Seller set forth in this Contract shall survive the Closing, and no action based thereon shall be commenced after the Closing.

§16.02. The delivery of the deed by Seller, and the acceptance thereof by Purchaser, shall be deemed the full performance and discharge of every obligation on the part of Seller to be performed hereunder, except those obligations of Seller which are expressly stated in this Contract to survive the Closing.

**Section 17.  Closing Costs**

§17.01. Purchaser shall pay all charges for recording and/or filing the deed and all charges in connection with the Assumption (as defined in §21). Seller and Purchaser acknowledge that the conveyance of the Premises may be exempt from New York State real estate transfer tax pursuant to §1405(b)(8) of the Real Estate Transfer Tax Law of the State of New York and from New York City real property transfer tax; provided, however, in the event that any transfer, conveyance or similar tax is imposed in connection with the conveyance of the Premises, whether due to a change in applicable law or otherwise, then Seller shall be responsible for, and shall pay in full as and when due, any such tax imposed by law on the grantor, together with interest and penalties. Each of the parties shall bear and pay the fees and disbursements of its own counsel, accountants and other advisors in connection with the negotiation in preparation of this Contract and the Closing. In no event shall Existing Mortgagee have any liability or obligation to pay any transfer taxes in connection with this transaction.

**Section 18.  Lead Paint, Etc.**

§18.01. Purchaser acknowledges that pursuant to regulations promulgated by the U.S. Department of Housing and Urban Development (24 CFR Part 35) and the Environmental Protection Agency (40 CFR Part 745), pursuant to §1018 of the Residential Lead Paint Hazard Reduction Act of 1992, Purchaser has the right to make Purchaser's obligations under this Contract contingent on a ten (10) day period to perform a risk assessment or inspection on the Premises for lead-based paint and/or lead-based paint hazards.

§18.02. Purchaser hereby represents that it has either (a) performed such risk assessment or inspection prior to the execution of this Contract or (b) waives its right to do so and any attendant rights of Purchaser to cancel this Contract for reasons related to the presence, if any, of lead-based paint and/or lead-based paint hazards.

§18.03. Purchaser acknowledges receipt of the pamphlet "Protect Your Family from Lead in Your Home."

## Section 19.    Downpayment and Proceeds to Existing Mortgagee

§19.01. Purchaser and Seller acknowledge that the Seller's interest in the Downpayment and the proceeds of the Purchase Price shall, as part of the Confirmation Order, be assigned to the Existing Mortgagee. Accordingly, notwithstanding anything to the contrary contained in this Contract, Seller and Purchaser acknowledge and agree that pursuant to the Plan, the balance of the Purchase Price, the Downpayment, and any apportionments due Seller hereunder shall be paid directly to the Existing Mortgagee or as directed by the Existing Mortgagee.

§19.02. Notwithstanding the provisions of §19.01, Seller and Existing Mortgagee acknowledge that Existing Mortgagee shall pay to Seller promptly following the Closing, Seller's share of the proceeds of the Purchase Price ("Seller's Share") as more particularly described in _Schedule H_ to be distributed in accordance with the Plan. Additionally, in the event there is a surplus in the Receiver's account following a final accounting which shall occur subsequent to the Closing, then such surplus shall be payable to Seller. In the even there is a deficit in the Receiver's account, then to the extent the escrow deposit set forth in _Schedule H_, does not cover such shortfall, Seller shall remain responsible for any such deficiency amount.

## Section 20.    Bankruptcy Court Approval and Related Matters

§20.01.     The purchase of the Premises by Purchaser on the Closing Date is expressly conditioned upon the entry of an order by the Bankruptcy Court confirming the Plan to be predicated solely upon a sale of the Premises pursuant to this Contract without any bidding as a private sale (the "Confirmation Order"), which Confirmation Order shall not be stayed. The Confirmation Order shall provide, inter alia, that Purchaser is a good faith purchaser of the Premises, pursuant to §363(m) of the Bankruptcy Code and that the Premises are sold and conveyed free and clear of all liens, mortgages, claims, taxes and other debts of the Seller, except for the Permitted Exceptions and other matters as herein provided.

§20.02. Due to the fact that the sale will provide for payment in full of all creditors of Seller other than Existing Mortgagee, and that Seller and Existing Mortgagee consent to this sale, Seller shall request approval of this Contract without the need for competitive bidding, although Purchaser acknowledges that such request remains within the discretion of the Bankruptcy Court and is subject to the Bankruptcy Court approval. Seller, in accordance with all applicable requirements and procedures under the Bankruptcy Code, shall use its reasonable efforts to request the entry of an order approving Seller's consummation of this Contract as a private sale pursuant to the Plan and dispensing with the solicitation of any higher or better offers for the Premises.

13

§20.03. In the event the Confirmation Order is not entered on or before February 2, 2010 then, subject to the next sentence, this Contract shall automatically be terminated, whereupon the Downpayment shall be returned to the Purchaser and this Contract shall become null and void, except as to those covenants which expressly survive the termination of this Contract. Notwithstanding the foregoing, in the event the Confirmation Order is not entered into on or before February 2, 2010, Existing Mortgagee shall have the right to extend such date to a date no later than March 1, 2010, and if the Confirmation Order is not entered by March 1, 2010, then this Contract will automatically be terminated, whereupon the Downpayment shall be returned to the Purchaser and this Contract shall become null and void, except as for those covenants which expressly survive the termination of this Contract.

§20.04. This Contract shall be incorporated under the Plan and approved as part of the confirmation process pursuant to 11 U.S.C. §363 (b)+(f). In no event shall the Closing occur prior to the time of the entry of the Confirmation Order so as to, among other items, preserve the parties ability to obtain the benefit of transfer tax exemptions under 11 U.S.C. §1146(a).

## Section 21.  Existing Mortgage Assumption

21.01. Seller and Purchaser acknowledge that the Premises are currently encumbered by (i) certain mortgages which were consolidated and modified pursuant to a Consolidation, Modification and Extension Agreement dated June 29, 2006 between Seller and Existing Mortgagee in the original principal amount of $8,000,000.00 and recorded on July 20, 2006, and thereafter modified by Modification of Note and Mortgage Agreement dated March 28, 2007 and recorded on May 14, 2007 (collectively, the "Existing Mortgage"), which Existing Mortgage has an outstanding principal balance of $7,905,529.93 and (ii) a second mortgage made by Seller to Existing Mortgagee in the original principal amount of $200,000.00 dated March 28, 2007 and recorded on May 14, 2007 (the "Second Mortgage), which Second Mortgage has an outstanding principal balance of $198,004.82. Purchaser and Seller acknowledge and agree that, as a condition to Purchaser's obligation to close title hereunder, (i) the Existing Mortgage will be reduced to $7,700,000.00 and modified and extended by the Existing Mortgagee in accordance with and subject to the terms and conditions of that certain commitment letter to be issued by the Existing Mortgagee to Purchaser contemporaneously with the execution of this Agreement (the "Commitment Letter") and (ii) the Second Mortgage will be satisfied of record. Purchaser agrees to furnish the Existing Mortgagee with such information and documentation as may be requested by the Existing Mortgagee in accordance with the terms of the Commitment Letter and shall cooperate with the Existing Mortgagee and with Seller in an effort to expeditiously procure the assumption and modification of the Existing Mortgage (the "Assumption"). Purchaser acknowledges and agrees that Purchaser shall pay all of the costs and expenses associated with the Assumption.

## Section 22.  Existing Mortgagee's Consent

§22.01. The Existing Mortgagee has executed this Contract for the purposes of consenting to the conveyance of the Premises to Purchaser subject to Purchaser satisfying the requirements of the Assumption, and to the provisions inuring to the benefit of the Existing Mortgagee.

§22.02. Seller and Purchaser acknowledge and agree that this transaction cannot be consummated without the consent of the Existing Mortgagee as the amount secured by the Existing Mortgage and the Second Mortgage held by the Existing Mortgagee exceeds the Purchase Price. Notwithstanding Existing Mortgagee's consent to the conveyance, Seller acknowledges and agrees that (i) Existing Mortgagee is not, by virtue of executing this Contract or otherwise, waiving any default which may exist or which may hereafter occur under the Existing Mortgage and the Second Mortgage or any other document or instrument executed in connection with the Existing Mortgage and the Second Mortgage (collectively, the "Loan Documents") and any actions taken or statements made pursuant to this Contract shall not constitute or evidence any waiver, estoppel, release, modification, limitation, forbearance or any agreement by Existing Mortgagee to delay the exercise of Existing Mortgagee's rights or remedies under any of the Loan Documents, at law or equity, including any rights pursuant to the Foreclosure Proceeding and any rights to collect interest at the default rate and (ii) nothing herein shall constitute a reinstatement, modification, amendment, extension or waiver of any of the Loan Documents. Purchaser acknowledges and agrees that Existing Mortgagee reserves all of its rights and remedies in connection with defaults of Seller under the Existing Mortgage and the Second Mortgage or any of the other Loan Documents, including all rights pursuant to the Foreclosure Proceeding subject to the Bankruptcy Court. The provisions of this §22 shall survive the termination of this Contract.

§22.03. Upon consummation of the Closing, Existing Mortgagee shall deliver to Purchaser a satisfaction of the Second Mortgage.

**Section 23.    Conditions to Closing**

§23.01. It shall be a condition to Purchaser's obligation to close hereunder that the following shall be true and correct in all material respects as of the Closing:

(a)    No additional employees shall be hired (other than replacements), by Seller, Receiver or their respective managing agents, and there shall be no employment agreements or union contracts entered into after the date hereof.

(b)    The following work shall be completed on or prior to the Closing Date:

(i)    The sewage in the basement flowing directly into the ground shall be tied into the main drain line.

**Section 24.    Miscellaneous Provisions**

§24.01. Purchaser shall not assign this Contract or its rights hereunder without the prior written consent of Existing Mortgagee. Notwithstanding the foregoing, Purchaser may assign its rights under this Contract to a newly formed New York limited liability company subject to the following conditions: (i) Miao-Ling Lin, Yu Xin Wu and Min Wu shall maintain at least 100% percent ownership interest in the aggregate and shall control the affairs of the entity constituting assignee, (ii) such entity shall assume the Commitment Letter and be in conformance with the

requirements of the Commitment Letter, (iii) such assignee must assume all of the Purchaser's obligations hereunder pursuant to an assignment and assumption agreement reasonably satisfactory to Existing Mortgagee, and (iv) notice of such assignment shall be provided to Seller and Existing Mortgagee no less than ten (10) business days prior to the Closing Date. No permitted assignment of Purchaser's rights under this Contract shall be effective against Seller unless and until an executed counterpart of the instrument of assignment shall have been delivered to Seller and Existing Mortgagee and Seller and Existing Mortgagee shall have been furnished with the name and address of the assignee. The term "Purchaser" shall be deemed to include the assignee under any such effective assignment.

§24.02. This Contract embodies and constitutes the entire understanding between the parties with respect to the transaction contemplated herein, and all prior agreements, understandings, representations and statements, oral or written, are merged into this Contract. Neither this Contract nor any provision hereof may be waived, modified, amended (including any adjournments), discharged or terminated except by an instrument signed by Existing Mortgagee and the party against whom the enforcement of such waiver, modification, amendment, discharge or termination is sought, and then only to the extent set forth in such instrument.

§24.03. This Contract shall be governed by, and construed in accordance with, the laws of the State of New York. The Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Contract and to resolve any and all disputes relating to the interpretation and implementation of this Contract. The provisions of this §24.03 shall survive the Closing or the earlier termination of this Contract.

§24.04. The captions in this Contract are inserted for convenience of reference only and in no way define, describe or limit the scope or intent of this Contract or any of the provisions hereof.

§24.05. This Contract shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs or successors and permitted assigns.

§24.06. This Contract shall not be binding or effective until properly executed and delivered by Seller, Purchaser and Existing Mortgagee.

§24.07. As used in this Contract, the masculine shall include the feminine and neuter, the singular shall include the plural and the plural shall include the singular, as the context may require.

§24.08. If the provisions of any schedule or rider to this Contract are inconsistent with the provisions of this Contract, the provisions of such schedule or rider shall prevail.

§24.09. Purchaser shall have the right, within seventy-two (72) hours prior to the Closing Date, to inspect the Premises, provided that, Purchaser shall provide the Existing Mortgagee with reasonable notice of such inspection and a representative of Besen & Associates, Inc. shall accompany Purchaser on such inspection.

**IN WITNESS WHEREOF,** the parties hereto have executed this Contract as of the date first above written.

Seller: **Icon Realty Corp.**

By: _____
President

Purchaser: _____
**Miao-Ling Lin**

_____
**Yu Xin Wu**

_____
**Min Wu**

Existing Mortgagee: **Intervest National Bank**

By: _____
Stephen Helmer
Vice President

Purchaser and Seller, by executing this Contract, consent to the financial stability of the depositary bank and agree to hold Escrowee harmless for all loss, cost or damage by reason of any bank failure.

**Receipt by Escrowee**

The undersigned Escrowee hereby acknowledges receipt of $500,000.00, by check subject to collection, to be held in escrow pursuant to §2.03.

**Stewart Title Insurance Company**

By: _____

17

**Schedule A**

DESCRIPTION OF PREMISES

Block 2217, Lot 51

ALL that certain plot, piece or parcel of land, situate, lying and being in the Borough of Manhattan County, City and State of New York, bounded and described as follows:

BEGINNING at the corner formed by the intersection of the northwesterly side of Nagle Avenue with the northeasterly side of Dyckman Street;

RUNNING THENCE northeasterly along the northwesterly side of Nagle Avenue, 100 feet;

THENCE northwesterly parallel with Dyckman Street, 155 feet to the center line of the block between Nagle Avenue and Post Avenue;

THENCE southwesterly along the center line of the block and part of the distance through a party wall, 100 feet to the northeasterly side of Dyckman Street;

THENCE southeasterly along the northeasterly side of Dyckman Street, 155 feet to the corner aforesaid, the point or place of BEGINNING.

## Schedule B

### PERMITTED EXCEPTIONS

1.     Zoning regulations and ordinances which are not violated by the existing structures or present use thereof and which do not render title uninsurable.

2.     Consents by the Seller or any former owner of the Premises for the erection of any structure or structures on, under or above any street or streets on which the Premises may abut.

3.     Leases and Tenancies specified in the Rent Schedule and any new leases or tenancies not prohibited by this Contract.

4.     Exceptions to title, if any, specified in Existing Mortgagee's title insurance policy, a copy of which has been furnished to Purchaser.

5.     Financing statements, chattel mortgages and liens on personalty filed more than five (5) years prior to the Closing Date and not renewed, or filed against property or equipment no longer located on the Premises or which are owned by Tenants.

6.     (a)     Rights of utility companies to lay, maintain, install and repair pipes, lines, poles, conduits, cable boxes and related equipment on, over and under the Premises.

    (b)     Encroachments of stoops, areas, cellar steps, trim cornices, lintels, window sills, awnings, canopies, ledges, fences, hedges, coping and retaining walls projecting from the Premises over any street or highway or over any adjoining property and encroachments of similar elements projecting from adjoining property over the Premises.

    (c)     Revocability or lack of right to maintain vaults, coal chutes, excavations or sub-surface equipment beyond the line of the Premises.

    (d)     Any state of facts that an accurate survey would disclose, provided that such facts do not render title unmarketable. For the purposes of this Contract, none of the facts shown on the survey identified below shall be deemed to render title unmarketable, and Purchaser shall accept title subject thereto. Survey dated April 20, 2005 prepared by Kulhanek and Plan Land Surveyors, P.C.

7.     Sidewalk Violation filed 6/1/00 – Reference N. 79167.

8.     The Existing Mortgage and financing statements and other collateral assignments ancillary thereto, as same shall be modified at the Closing in accordance with the terms of the Commitment Letter.

**Schedule C**

PURCHASE PRICE

The Purchase Price shall be paid as follows:

(a) By check or wire transfer in accordance with the provisions of §2.02, subject to collection, the receipt of which is hereby acknowledged by Seller:                                      $ 500,000.00

(b) By acceptance of title subject to the Existing Mortgage as modified and as more fully set forth in Section §21.                                      $7,700,000.00

(c) By check(s) or wire transfer delivered at the Closing in accordance with the provisions of §2.02:                                      $2,000,000.00

**Purchase Price**                                      $10,200,000.00

I:\Users\Share\Intervest\Loans\Intervest National Bank\170-174 Nagle Avenue, NY\Contract of Sale – Draft 12-18-09.Wu.doc

**Schedule D**

MISCELLANEOUS

1.  Title insurer designated by the parties (§1.02):      Chatham Abstract, Inc., as agent
                                                          for Stewart Title Insurance Company

2.  Seller's tax identification number (§2.05):          11-3216031

3.  Purchaser's tax identification number (§2.05):       _____

4.  Scheduled time and date of Closing (See §3.01)

5.  Place of Closing (See §3.01)

6.  Broker, if any (§14.01):                             Besen & Associates, Inc.

7.  Party to pay broker's commission (§14.01):           Seller

9.  Address for notices (§15.01):

    If to Seller:

        Icon Realty Corp.
        c/o Vasillos Roufanis
        POB 090—633
        Fort Hamilton
        Brooklyn, New York 11209
        Telephone:

    with a copy to Seller's attorney:

        Mark A. Frankel, Esq.
        Backenroth Frankel & Krinsky LLP
        489 Fifth Avenue
        New York, New York 10017
        Telephone: (212) 593-1100
        Facsimile: (212) 644-0544
        Email: mfrankel@bfklaw.com

I:\Users\Share\Intervest\Loans\Intervest National Bank\170-174 Nagle Avenue, NY\Contract of Sale – Draft 12-18-09.Wu.doc

If to Purchaser:

> Miao-Ling Lin
> Yu Xin Wu
> Min Wu
> c/o Nolan Cheng, Esq.
> 11 East Broadway, Suite 7C
> New York, New York 10038
> Telephone: (212) 385-2122
> Facsimile: (212) 385-2022
> Email: nolancheng@yahoo.com

with a copy to Purchaser's attorney:

> Nolan Cheng, Esq.
> 11 East Broadway, Suite 7C
> New York, New York 10038
> Telephone: (212) 385-2122
> Facsimile: (212) 385-2022
> Email: nolancheng@yahoo.com

If to Existing Mortgagee:

> Intervest National Bank
> One Rockefeller Plaza, Suite 400
> New York, New York 10020
> Attn: Lowell S. Dansker
> Telephone: (212) 218-2800
> Facsimile: (212) 218-2808

with a copy to Existing Mortgagee's attorney:

> Steven R. Uffner, Esq.
> Goldberg Weprin Finkel Goldstein LLP
> 1501 Broadway, 22nd Floor
> New York, New York 10036
> Telephone: (212) 221-5700
> Facsimile: (212) 730-4518
> Email: suffner@gwfglaw.com

If to Escrowee:

> Stewart Title Insurance Company
> 300 East 42nd Street, 10th Floor
> New York, New York 10007
> Attn: Harold S. Boxer, Esq.
> Telephone: (212) 922-0050
> Facsimile: (914) 993-4488
> Email: hboxer@stewart.com

## Schedule E

## RENT SCHEDULE

(to be attached separately)

| Unit | Name | Rent |
|------|------|------|
| 101A | Moronta Food Corp / Fernando Moranta | ~~$5,000.00~~ 8112.00 |
| 101B | Restaurant 101, Inc. / Cirilo Moranta | $13,520.00 |
| 105A | Rapid Multi Service / Ricardo Perez | $6,000.00 |
| 105B | Expo Shoes Lts | $3,600.00 3700.00 |
| 107A | Han Soo Kim | $2,850.00 |
| 107B | Larry Villalobos | ~~$4,600.00~~ $4788.00 |
| 109A | ~~Han Tae Cho~~ Soon Ja Houng | $3,800.00 |
| 109B | Rafael Correa | $5,500.00 |
| 111A | Jose Morales / Jimmy Ortega | $2,750.00 |

### 170 Nagle Avenue

| Unit | Name | Rent |
|------|------|------|
| 1 | Demetrio Chino | ~~$2,091.29~~ 1800 |
| 21 | Nedalysis Peralta | $450.00 |
| 22 | Violetta Tavarez | $841.64 |
| 23 | Julian Gonzalez / Wendy Genao | $739.93 |
| 24 | Elsa Brea | $661.08 |
| 25 | Silvia Guzman | $654.61 |
| 31 | Anabel Lucas | ~~$718.26~~ 779.31 |
| 32 | Francisco Carela | $657.42 |
| 33 | VACANT ~~Last tenant $---~~ | |
| 34 | Osman Hernandez | $1,100.00 |
| 35 | Elsa Rodriguez | $1,185.00 |
| 41 | Luis Taveras | $742.27 |
| 42 | Lara Lazaro | $1,827.07 |
| 43 | Rafael Urea | $573.48 |
| 44 | Luis Gallapa / Carmen Palaguachi | $935.47 |
| 45 | Romita Rodriguez | $1,287.37 |
| 51 | Frank Costanzo | $676.89 |
| 52 | Manuel Locano | $1,400.00 |
| 53 | Ana Rosado | $501.23 |
| 54 | Australia Taveras | $573.55 |
| 55 | Daniel Lara | $1,346.51 |

### 172 Nagle Avenue

| Unit | Name | Rent |
|------|------|------|
| 1 | Cirilo Moronta | $927.00 |
| 21 | Rosa Paulina | $616.40 |
| 22 | Luis Garcia | $1,500.00 |
| 23 | Fausto Morales | $1,000.00 |
| 24 | Alfredo Cordova | $936.70 |
| 31 | Wan Yeung | $612.85 |
| 32 | Maria Pena | $621.36 |
| 33 | VACANT ~~Last tenant $755.00~~ | |

| 34 | Pablo Cruz | $651.39 |
| 41 | Rose Rodriguez | $754.39 |
| 42 | Feliz Isuaro | $690.58 |
| 43 | Gloria Moran | $667.31 |
| 44 | Isaura Gonzalez | $746.11 |
| 51 | Eduardo Fernandez | $1,085.00 |
| 52 | Antonio Rodriguez | $719.46 |
| 53 | Ramona Diaz | $867.~~79~~ 19 |
| 54 | Alexandra Mejia | ~~$1,250.00~~ 1,000 |

### 174 Nagle Avenue

| 1 | Esther Sanchez / Victor Chino | $1,030.00 |
| 21 | Francisco Hernandez | $900.00 |
| 22 | VACANT ~~$900.00~~ | |
| 23 | Ambrosio Sanchez Chino | $1,051.55 |
| 24 | Pascual Pantaleon | $948.31 |
| 25 | Altagracia Vazquez | $748.43 |
| 31 | Jennisel Marte | $772.50 |
| 32 | Isidoro Teodomino | $1,692.00 |
| 33 | Jose Matias | $639.74 |
| 34 | Juana Tejada | $667.36 |
| 35 | Oscar Hernandez | $928.93 |
| 41 | Juan Hidalgo | $1,028.61 |
| 42 | Angel Gregorio | $1,249.35 |
| 43 | Guillermo Marengo | $582.28 |
| 44 | Yoselyn Reyes | $885.86 |
| 45 | Estella Taveras | $793.28 |
| 51 | Sheung Rhee | $632.26 |
| 52 | Hilda Reyes | $668.89 |
| 53 | Hugo Patricio | $1,250.00 |
| 54 | Pedro Martinez | $667.68 08· |
| 55 | Maria Molina | $603.33 |

TOTAL ~~$~~ 

ANNUAL RENT ROLL ~~$~~

## Schedule F

### EMPLOYEE SCHEDULE

1.    One Superintendent

## Schedule H

### SELLER'S SHARE

Purchase Price:                                                    $10,200,000.00*

Less Existing Mortgage Assumption:                    $7,700,00.00
Less Disbursements payable to:

Existing Mortgagee representing
its share of transfer tax savings:            $150,000.00**

Existing Mortgagee representing
the principal balance due under the
Existing Mortgage and the Second
Mortgage: to be applied as follows:
($205,529.93 toward paydown of
Existing Mortgage leaving a balance
of $7,700,000 and $198,004.82
toward satisfaction of Second
Mortgage:                                      $403,534.75

Existing Mortgagee representing
interest due through and including
the Closing Date (calculated at an
interest rate of 6.375% *per annum*
on the Existing Mortgage and
7.00% *per annum* on the Second
Mortgage):                                     [To be determined at or
                                                prior to Closing***]

Existing Mortgagee representing
additional interest above the contract
interest rates referenced above through
and including the Closing Date
(calculated at an interest rate of 1.00%
*per annum* on the Existing Mortgage
and Second Mortgage):                          [To be determined at or
                                                prior to Closing***]

Existing Mortgagee representing
accrued late charges ($5,800.00 x 15):         $87,000.00

I:\Users\Share\Intervest\Loans\Intervest National Bank\170-174 Nagle Avenue, NY\Contract of Sale – Draft 12-18-09.Wu.doc

Schedule H continued

Existing Mortgagee representing
the Exit Fee:                                          $80,000.00

Existing Mortgagee representing
the escrow account deficit:                      [To be determined at or
                                                              prior to Closing]

Existing Mortgagee representing
its share of brokerage commission
savings for account of Seller:                    $50,000.00

Existing Mortgagee representing
Consent Fee                                           $20,000.00

Existing Mortgagee's
legal fees for the foreclosure
and bankruptcy:                                      $40,000.00

Existing Mortgagee representing
Referee's fee                                           $1,500.00

Besen & Associates, Inc. representing
brokerage commission                             $200,000.00

Goldberg Weprin Finkel Goldstein LLP
representing Existing Mortgagee's
legal fees for the Closing:                         $25,000.00

Representing payment of all Creditors
(other than Existing Mortgagee and
Andrew Glass Mortgage Brokerage, Inc.,
who are both listed separately herein)      [To be determined at
                                                              or prior to Closing]

Andrew Glass Mortgage Brokerage, Inc.
representing satisfaction of junior mortgage
($30,000.00 plus accrued but unpaid interest):   [To be determined at
                                                              or prior to Closing]

Purchaser representing payment of
tenant securities as determined
pursuant to §12.04                            [To be determined at
                                              or prior to Closing]

Escrow deposit for final Receiver's
accounting:                                   $75,000.00****

Additional title charges payable by
Seller (including, without limitation,
any Environmental Control Board Liens,
Judgments, Illuminated Sign Fees,
Elevator Inspection Fees, Rent
Stabalization Fees, Emergency Repair
Liens and fines and penalties related to
the Violations (to the extent any of same
are not discharged by the Confirmation
Order)                                        [To be determined at
                                              or prior to Closing]

All administrative expense obligations
incurred during the bankruptcy proceeding,
including Seller's professional fees and
fees owed to the US Trustee                   [To be determined at
                                              or prior to Closing]

Total Disbursements                           $_____.00


Purchase Price                                                    $10,200,000.00*

                        Less Mortgage Assumption                  $7,700,000.00

                        Less Total Disbursements                  $_____.00

                                Seller's Share                    $_____.00


*to the extent the net apportionments provided for in §12 are in favor of the Purchaser, then for the sole purpose of
calculating Seller's Share, the Purchase Price of $10,200,000.00 shall be reduced by the amount of the net

apportionments in favor of Purchaser. To the extent the net apportionments are in favor of Seller, such sum shall be paid to or for the account of Seller.

**It is intended that the conveyance be exempt from New York City and New York State transfer taxes and that Existing Mortgagee shall receive a portion of such savings in the amount of $150,000.00 as noted above. In the event the conveyance is not exempt, then transfer taxes aggregating $308,550.00 shall be due and payable at the Closing and a new line item for payment of transfer taxes in the amount of $308,550.00 will be added to the schedule of disbursements and the line item reflecting a transfer tax savings credit of $150,000.00 to Existing Mortgagee shall be deleted; it being understood and agreed that Seller shall be responsible for payment of all transfer taxes.

***Existing Mortgagee's interest accrual is computed through and including the Closing Date.

****In the event there is a shortfall in the Receiver's account upon a final accounting, then the escrow of $75,000 (or a portion thereof) shall be utilized to fund any such shortfall. Any funds remaining in the escrow following the funding of any shortfall shall be paid to Seller. Further, in the event there is a surplus in the Receiver's account, the escrow of $75,000.00 shall be paid to Seller.

I:\Users\Share\Intervest\Loans\Intervest National Bank\170-174 Nagle Avenue, NY\Contract of Sale – Draft 12-18-09.Wu.doc

## Exhibit A

### ASSIGNMENT AND ASSUMPTION OF LEASES AND RENTS

ASSIGNMENT AND ASSUMPTION OF LEASES AND RENTS (the "Assignment") made as of the ___ day of December, 2009, by and between **ICON PROPERTIES CORP.**, a New York corporation, having an address at _____ (the "Assignor"), and _____, a New York _____, having an address _____ (the "Assignee").

WHEREAS, Assignor is the landlord under all of the tenant leases (the "Leases") affecting the premises located at 170-174 Nagle Avenue, New York, New York a/k/a 101-111 Dyckman Street, New York, New York (the "Premises"), and landlord of any other occupants at the Premises and desires to assign to Assignee all of Assignor's right, title and interest in and to all of the Leases and occupancies and the rents thereunder, together with the amount of the security deposits, if any (the "Security Deposits"), as set forth on Exhibit ___ hereto and made a part hereof; and

WHEREAS, simultaneously herewith, Assignor has conveyed the Premises to Assignee pursuant to a Contract of Sale between Assignor and Assignee dated December ___, 2009 (the "Agreement").

NOW, THEREFORE, in consideration of Ten ($10.00) Dollars and other good and valuable consideration in hand paid by Assignee, the receipt and sufficiency of which are hereby acknowledged, Assignor and Assignee do hereby agree as follows:

1.      Assignor does hereby assign to Assignee all of its right, title and interest in and to (i) the Leases and rents (including Additional Rents) thereunder, together with any arrears (subject to the terms of the Agreement) and (ii) the Security Deposits.

2.      Assignee hereby accepts this Assignment, and assumes and agrees to be bound by the terms, covenants and conditions of the Leases and obligations of landlord with respect to the occupancies arising on or after the date hereof. Without limiting the generality of the preceding sentence, Assignee acknowledges the receipt of the Security Deposits. Assignee has received Security Deposits in the amount of $_____ and indemnifies Assignor and Intervest National Bank to the extent of the Security Deposits so received.

3.      This Assignment is made without representations or warranties, expressed or implied, and is without recourse against Assignor in any event whatsoever.

4.      This Assignment shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.

### SIGNATURES FOLLOW ON THE NEXT PAGE

**IN WITNESS WHEREOF,** this Assignment has been entered into on the date first above written.

ASSIGNOR:                                ASSIGNEE:

**ICON PROPERTIES CORP.**


By:_____        By:_____
    Name:                                    Name:
    Title:                                      Title:

**Exhibit B**

## ASSIGNMENT OF SERVICE CONTRACTS

ASSIGNMENT OF SERVICE CONTRACTS (the "Assignment") made as of the ____ day of December, 2009, by and between **ICON PROPERTIES CORP.**, a New York corporation, having an address at _____ (the "Assignor"), and _____, a _____, having an address _____ (the "Assignee").

In consideration of Ten ($10.00) Dollars and other good and valuable consideration in hand paid by Assignee, the receipt and sufficiency of which are hereby acknowledged, Assignor hereby assigns unto the Assignee all of Assignor's right, title and interest in and to the following:

All of the services contracts covering premises located at 170-174 Nagle Avenue, New York, New York a/k/a 101-111 Dyckman Street, New York, New York (the "Premises") and in full force and effect as of the date hereof, as set forth in SCHEDULE A annexed hereto and made a part hereof (the "Service Contracts").

TO HAVE AND TO HOLD the same unto Assignee, its successors and assigns, from and after the date hereof, subject to the terms, covenants, conditions and provisions contained in the Service Contracts.

ASSIGNEE hereby accepts this Assignment, agrees to be bound by the terms, covenants and conditions of the Service Contracts and assumes the obligations of the Assignor accruing from and after the date hereof with respect to the Service Contracts.

**IN WITNESS WHEREOF,** this Assignment has been entered into on the date first above written.

**ASSIGNOR:**                                         **ASSIGNEE:**

**ICON PROPERTIES COPR.**

By:_____            By:_____
     Name:                                          Name:
     Title:                                              Title:

## EXHIBIT B

## ASSETS AND LIABILITIES

Assets
Real Property (estimated fair market value).................................... $ 10,200,000
Automobile.................................................................................. $      31,000

Total                                                                                             $ 10,231,000


Liabilities
Intervest Mortgage (including default interest only)..................... $ 10,600,000
Glass Mortgage........................................................................... $      35,000
Ford Motor Credit........................................................................ $      23,708
Priority Claims........................................................................... $       5,428
General Unsecured Claims........................................................... $     102,264
Administration Claims................................................................. $      25,000
Tenant Security Deposits............................................................. $     120,000

Total                                                                                             $ 10,911,400


## CHAPTER 7 LIQUIDATION ANALYSIS

Assets
Real Property (estimated fair market value).................................... $ 10,200,000
Automobile.................................................................................. $      31,000

Total                                                                                             $ 10,231,000

Liabilities

Intervest Mortgages..................................................................... $ 10,200,000
Glass Mortgage........................................................................... $       -0-
Ford Motor Credit........................................................................ $      23,708
Priority Claims........................................................................... $       -0-
General Unsecured Claims........................................................... $       -0-
Administration Claims................................................................. $       7,292
Tenant Security Deposits............................................................. $       -0-

Total                                                                                             $ 10,231,000

**PROJECTED ALLOCATION OF PURCHASE PRICE FROM SALE OF REAL PROPERTY**

**Purchase Price:**

$10,200,000

|  |  |
|---|---|
| Mortgage Assignment: | $7,700,000 |
| Cash at Closing: | $2,500,000 |

**Allocation of Cash at Closing:**

Intervest Mortgages: $1,909,167

| | |
|---|---|
| Bank Share of Transfer tax Savings | 150,000 |
| Principal Paydown | 403,535 |
| Outstanding Contract rate interest plus 1% | 847,132 |
| Late Charges | 87,000 |
| Exit Fee | 80,000 |
| Escrow Account Deficit(estimated) | 5,000 |
| Bank Share of Broker Fee Savings | 50,000 |
| Consent Fee | 20,000 |
| Legal Fees Reimbursement | 65,000 |
| Referees Fee Reimbursement | 1,500 |
| Broker Fee Reimbursement | 200,000 |
| TOTAL | $1,909,167 |

| | |
|---|---|
| Andrew Glass Mortgage | 35,000 |
| Ford Motor Credit | 6,096 |
| Priority  Creditors | 5,428 |
| General Unsecured Creditors | 102,264 |
| Tenant Security Deposits | 120,000 |
| Administration Claims | 25,000 |
| Receiver Reserve | 75,000 |
| UST Fees | 10,000 |
| | $2,287,955 |

Surplus For Equity Holder:  $212,045, plus unliquidated  amount equal to Receiver's surplus following final accounting